**SCHILLER & SCHMIDT, INCORPO-
RATED, Plaintiff–Appellant,**

v.

**NORDISCO CORPORATION, et
al., Defendants–Appellees.**

Nos. 91–2195, 91–2781.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 28, 1992.

Decided July 23, 1992.

Douglass G. Hewitt, George J. Lynch, Wilson & McIlvaine, John Bostjancich, David C. Hilliard (argued), Douglas N. Masters, Pattishall, McAuliffe, Newbury, Hilliard & Geraldson, Chicago, Ill., for plaintiff-appellant.

Robert S. Dorband (argued), Jacquelyn C. Haynes, Borovsky & Ehrlich, Chicago, Ill., for defendants-appellees.

Before POSNER, FLAUM, and KANNE, Circuit Judges.

POSNER, Circuit Judge.

Schiller and Schmidt, a seller of office supplies, brought suit against a competitor, Nordisco, charging copyright infringement and misappropriation of trade secrets. (The other defendants and other charges require no discussion.) The judge found no copyright infringement and awarded damages of only $16,545 for the misappropriation. Schiller and Schmidt (we shall call it "Schiller" for short) appeals, raising issues concerning works for hire, infringement of copyrighted compilations, and proof of damages.

The suit grows out of a family squabble. James Rybak, the nephew of Schiller's president, Bernard Garvey, was an employee of his uncle's company when in 1979 he launched the company into the mail order business by creating a catalog of office supplies sold by Schiller. The catalog consisted of product descriptions and prices together with photographs of the products. The product descriptions were based on but not copied verbatim from printed information supplied to Schiller by the manufacturers of the products. The manufacturers were the source of the vast majority of the photos as well, although Rybak determined the layout of each product's photos—that is, how they would be arranged in relation to each other and to the text. (The pictures at the end of this opinion are of sample layouts from the catalogs of the parties and of other mail order houses.) Some of the photos in the catalog did not come from manufacturers but instead had been made at Rybak's direction by "Spotline Studios," the name under which the photographer Carl Bertel did business. Rybak would take the office supplies that he wanted photographed to Bertel's studio and would give him some, though apparently few, directions with regard to the positioning of the objects to be photographed.

By the middle of 1983 Schiller was mailing 200,000 copies of its catalog quarterly and was making some $2 million a year in mail order sales. But Garvey was concerned about the cost of the catalog and also wanted to give his son Kenneth a bigger role in the mail order end of the business. Rybak, whose employment contract with Schiller did not contain a noncompetition clause, decided to leave and form his own mail order office supplies company. He took with him his father (another employee of Schiller), hundreds of photos (which he later returned to Schiller) including those he had commissioned on Schiller's behalf from Bertel, and the mailing list for Schiller's catalog. Rybak's company, Nordisco, brought out its own catalog later in 1983, precipitating this suit filed two years later. Schiller claimed that not only Nordisco's first catalog, but its subsequent catalogs as well, infringed Schiller's catalogs. It sought damages in excess of $1 million based on a decline in its mail order sales that set in after Nordisco's catalog came out.

The focus of the evidence at trial was Nordisco's first catalog. A third of the entries appear to duplicate the corresponding entries in Schiller's summer 1983 cata-

log, as is evident from the illustrations at the end of this opinion. Among the duplicate entries, 18 use photos taken by Bertel for Rybak when the latter was employed by Schiller. Although Schiller denies it and Nordisco did not help its cause by systematically misciting the record in its brief in our court, it is fairly clear that the photos in the 40–plus other duplicate entries come from the product manufacturers—there was no second Bertel who took photos for Schiller. Schiller did, however, create the layouts for the photos supplied by the manufacturers, and Nordisco appears to have duplicated those layouts.

The plaintiff claims three sources of copyright protection. First, it claims to own copyright in the 18 photos, and if so there is no doubt that Nordisco infringed by copying the photos into its own catalog. Nordisco denies that Schiller is the copyright owner. Second, Schiller claims that Nordisco infringed its copyright on the catalog itself, viewed as a compilation. Nordisco should (but doesn't) concede that Schiller has such a copyright, but it denies any infringement. Third, Schiller claims that Nordisco infringed its copyright on individual layouts within the compilation, that is, on separately copyrightable components of the compilation. Nordisco again denies infringement.

■ Bertel made the 18 photos, but Schiller owned the copyrights in them if they were "works for hire," or if Bertel assigned the copyrights to Schiller. 17 U.S.C. §§ 101(1), (2), 201(b), (d). Since no one could suppose after *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), that Bertel was an employee of Schiller, they were works for hire only if they fell in one or more of the categories of intellectual property enumerated in section 101(2), as they did, *and* were specially commissioned by Schiller, as they were, *and* the parties had signed a statement to that effect—which they had not. What is true is that in 1988, long after this suit had begun, Bertel obligingly signed a statement in which he "agree[d] that Schiller and Schmidt has owned the copyright [in the photos], and I

hereby assign any remaining copyright which I may own in any photographs which I took for Schiller and Schmidt, and any right to maintain actions, now or hereafter existing, for alleged infringement thereof" to Schiller. The statement was not signed by Schiller, however, as the statute required if the photos were to be works for hire. The statutory language is "signed by them," 17 U.S.C. § 101(2), that is, by both parties, and it means what it says. 1 Paul Goldstein, *Copyright: Principles, Law and Practice* § 4.3.2.2, at p. 405 and n. 54 (1989).

■ The statement also came too late. The requirement of a written statement regarding the copyright on a specially commissioned work is not merely a statute of frauds, although that is the purpose emphasized by the cases. *Dumas v. Gommerman*, 865 F.2d 1093, 1101 (9th Cir. 1989); *Easter Seal Society for Crippled Children and Adults of Louisiana, Inc. v. Playboy Enterprises, Inc.*, 815 F.2d 323, 328 n. 8 (5th Cir.1987). That is, it is not only designed to protect people against false claims of oral agreements. If it were, then it might not matter when the statement had been made or signed, *Monetti, S.P.A. v. Anchor Hocking Co.*, 931 F.2d 1178, 1183 (7th Cir.1991); *Cattin v. General Motors Corp.*, 955 F.2d 416, 429–30 (6th Cir.1992), although there is authority that it must be signed before suit is brought. *Watson v. McCabe*, 527 F.2d 286, 289 (6th Cir.1975); E. Allan Farnsworth, *Contracts* § 6.7, at p. 428 and n. 19 (2d ed. 1990). This is an esoteric question, since ordinarily the absence of the requisite statement will lead to the dismissal of the suit before it can be tendered. Cf. *Pommer v. Medtest Corp.*, 961 F.2d 620, 625 (7th Cir.1992); *DF Activities Corp. v. Brown*, 851 F.2d 920, 922–23 (7th Cir.1988). We need not try to resolve the question here. For the signed-statement requirement in section 101(2) has a second purpose—to make the ownership of property rights in intellectual property clear and definite, so that such property will be readily marketable. Cf. *Community for Creative Non–Violence v. Reid, supra*, 490 U.S. at 750, 109 S.Ct. at 2178; 1 Goldstein, *supra*, § 4.3.2.2, at pp. 404–05.

The creator of the property is the owner, unless he is an employee creating the property within the scope of his employment or the parties have agreed in a writing signed by both that the person who commissioned the creation of the property is the owner. The writing must precede the creation of the property in order to serve its purpose of identifying the (noncreator) owner unequivocally. It did not precede it here.

Schiller also (though sketchily) argues assignment, 17 U.S.C. § 201(d), and bases the argument on the same document that we have quoted. If Bertel owned the copyrights, Nordisco infringed them, and Bertel rather than suing directly was entitled to assign the copyrights and with them the right to sue for infringement of them to Schiller. *SAPC, Inc. v. Lotus Development Corp.*, 921 F.2d 360 (1st Cir.1990). Nordisco does not argue that the assignment came too late for this suit to be timely even with respect to the infringements that occurred back in 1983. But it does argue that when Bertel sold his business in 1985 to Edmund Ojenus, including the negatives of the 18 photos copied in Nordisco's catalog, the copyrights in the photos were sold along with the photos themselves, leaving nothing for Bertel to assign to Schiller four years later. Schiller points out in response that the sale of the physical embodiment of intellectual property does not "of itself" transfer the intellectual property. 17 U.S.C. § 202. Obviously when a publisher sells books to a bookseller he does not mean to transfer the copyright in them so that the bookseller could copy the books and sell the copies without paying anything to the publisher. So we must look beyond the sale of the negatives to the sale *agreement* between Bertel and Ojenus, to see what was sold.

Although the agreement does not mention the word "copyright," its wording leaves little doubt that Bertel sold all the assets of Spotline Studios, tangible and intangible alike. If Bertel retained the copyright on the 18 photos in issue, Ojenus could not have made positives from the negatives without Bertel's permission, while Bertel could not have made positives

either because he had given up the negatives. An agreement that by dividing ownership in this way created such a stand-off would be inefficient (on the diseconomies of divided ownership see *Penn Central Corp. v. U.S. Railroad Vest Corp.*, 955 F.2d 1158, 1160 (7th Cir.1992)), and we do not lightly assume that this is what the parties intended; in fact Ojenus testified that he understood he was getting the copyrights. It is true that the Copyright Act requires that assignments be in writing, 17 U.S.C. § 204, but we have the writing (the sale agreement between Bertel and Ojenus); the issue is its interpretation. *SAPC, Inc. v. Lotus Development Corp., supra*, 921 F.2d at 363; *Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 746–47 and n. 7 (2d Cir.1975). We conclude that Ojenus obtained Bertel's copyrights, leaving nothing for Bertel to assign to Schiller. So if Nordisco infringed anyone's copyrights in the 18 photos, it infringed Ojenus's, and he is not a party to this suit.

Nordisco may still have infringed Schiller's copyright on the catalog, viewed as a compilation of public domain materials, like a telephone directory. 17 U.S.C. §§ 101, 103; *Feist Publications, Inc. v. Rural Telephone Service Co.*, —— U.S. ——, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Rockford Map Publishers, Inc. v. Directory Service Co.*, 768 F.2d 145 (7th Cir.1985). And there is a further possibility, which we shall take up first because of the emphasis that Schiller places on it. Many works are compilations of original copyrighted material *and* public domain materials. A casebook, for example, is a compilation of judicial opinions, which are not copyrightable, and of the casebook author's notes and commentary, which are. A copier of the casebook would infringe both the copyright in the original material (i.e., the notes and commentary) and the copyright in the compilation itself—the ordering and editing of the opinions. *Callaghan v. Myers*, 128 U.S. 617, 649–50, 9 S.Ct. 177, 185, 32 L.Ed. 547 (1888). Schiller's catalog would be a clear example of this sort of dual work if Schiller had owned the copyright on Bertel's 18 photos (or on any of the other photos), since Nordisco

copied them along with the compilational features of the catalog. Schiller did not own the copyrights on any of the photos in the catalog, but the catalog contained other material that was original—the layouts of the product photographs. A comparison of the parties' catalogs with those of other companies reveals that Nordisco may well have copied Schiller's layouts. Look at Figure 1 at the end of the opinion, which Schiller deems its strongest evidence of infringement (apart from the 18 photos, which unquestionably *were* copied but in which Schiller had no copyright). Apparently the manufacturer had supplied Schiller with uncopyrighted photos of covers of business reports, and Rybak, when he was working for Schiller, had arranged three of them side by side. He chose the same arrangement for Nordisco's catalog. As a glance at Figure 2 will reveal, this arrangement was not inevitable, among other reasons because there were more than three photos. But the photos are very similar, the choice of three to display was natural, and there are only so many different ways in which three photos could be arranged, of which side by side was the most obvious, making it possible if unlikely that Rybak did not in fact copy Schiller's catalog but merely chose the arrangement that looked best to him. *Cooling Systems & Flexibles, Inc. v. Stuart Radiator, Inc.*, 777 F.2d 485, 491–93 (9th Cir.1985). (Figures 3 and 4 present a similar comparison.) So it is merely damaging, and not conclusive, evidence of copying that Nordisco told its printer that the format of its catalog would be "exactly like" Schiller's catalog. The texts of the pairs of catalog advertisements in Figures 1 and 3 are also similar but no more so than was inevitable given that they were taken without infringing anyone's copyright by the same hand from the same sheets of information supplied by the same manufacturers.

We might still suppose the evidence of copying of the layouts compelling were it not that the creator of the copyrighted work and the infringer were the same person. Although one can and often does copy one's own work (and so may be an infringer if one doesn't own the copyright

on it), one is also more likely to duplicate one's own work without copying than another person would be likely to do. If Cézanne painted two pictures of Mont St. Victoire, we should expect them to look more alike than if Matisse had painted the second, even if Cézanne painted the second painting from life rather than from the first painting. Granted, in Figure 1 not only are the photos side by side in both catalogs; the *order and choice of photos* are the same. These circumstances reinforce an inference of copying. Yet we might not be sufficiently certain that Rybak had been copying himself, rather than hitting independently on the same solution to the same rather narrow problem of layout, to conclude that the district judge committed clear error in finding no copying—had that been what he found. This unfortunately is unclear. He said that while Nordisco's ads were "identical or very similar" to Schiller's, when the ads are "examined in the context of an entire page, [they] tend to lose the appearance of similarity." This looks like a finding that while individual ads may have been copied, the catalog as a compilation was not infringed; and these are separate issues. Nordisco could infringe specific copyrighted materials within the catalog without infringing the compilation—that is, the arrangement of materials to make a catalog. So we must remand the case for new findings on the question of infringement of individual ads.

 The district court's opinion is clear, however, that Nordisco did not infringe the catalog as a compilation—and clearly right. Schiller does not even contend that Nordisco copied the order of products or other typical features of a compilation. There are some similarities with respect to the design of the cover and certain other features of the catalog, but not so many—given the utilitarian and hence inevitably rather standardized format of a mail order catalog of office supplies—that we can say that the judge committed clear error in finding no infringement. Nordisco commits clear error, however, in arguing that Schiller had no copyright on the catalog because it omitted to

print a notice of copyright on the catalog for one of the quarters in 1981. The previous and later catalogs were copyrighted, so the only things that fell into the public domain were features of the catalog in question that had not been carried forward from previous catalogs. *Applied Innovations, Inc. v. Regents of University of Minnesota*, 876 F.2d 626, 631 (8th Cir. 1989). Nordisco has not identified any such features.

■ The misappropriation of the mailing list, a trade secret, is conceded and the only issue is damages. The judge limited his award to damages incurred in the first year of Nordisco's operation. Schiller claimed lost sales revenues attributable to Nordisco's competition in that year of $156,089 and the judge made a guess that a third of this loss was due to the theft of the mailing list and gave Schiller the profits it would have made on that third. In the circumstances this was a generous award; zero would have been a better guess (but Nordisco has not cross-appealed). Schiller's expert witness subtracted its catalog sales revenues between the date of Nordisco's entry in 1983 and the date of trial (1991) from the revenues that Schiller would have enjoyed had its catalog sales remained at their 1983 level. He ascribed the *entire* difference between these revenue streams, some $1.1 million, to Nordisco's misconduct, and none to Nordisco's lawful competition. Even more questionably, Schiller now asks us to ascribe the entire $1.1 million to the theft of the mailing list—while conceding that 95 percent of the names on the list came from mailing lists compiled by product manufacturers and purchasable by any catalog house, so that Nordisco could have bought them; eventually it did buy them.

Since the taking of the list was knowing and intentional—it really was theft—Schiller could have sued for Nordisco's profit attributable to the theft. 17 U.S.C. § 504; *Taylor v. Meirick*, 712 F.2d 1112, 1120 (7th Cir.1983). That profit, though, was at most a little more than the price of the manufacturer-compiled lists (the little more reflecting the 5 percent of names on the

list that were not on the manufacturer-compiled lists), and probably much less, though it would be Nordisco's burden to prove how much less. *Id.* at 1122; 17 U.S.C. § 504(b). Nordisco's profit would have to be discounted to reflect the fact that Nordisco bought the lists eventually, so that all it gained was the interest on the purchase price during the period in which it was using the stolen list. In any event, Schiller did not seek to recover Nordisco's profit.

It is plain enough that the real harm to Schiller has nothing to do with the misconduct charged in this suit. The cause was Rybak's quitting and taking his father (who apparently had good customer contacts) with him and setting up in competition with Schiller—all of which was perfectly lawful. Son Kenneth, who took Ryback's place in Schiller's catalog operation, lacked Ryback's experience, as well as being handicapped as a designer of catalog covers and layouts by being colorblind. Schiller was bound to lose sales to Nordisco. The theft of the mailing list may have given Nordisco a bit of a headstart. But evidence that the district judge was entitled to believe revealed that most of Nordisco's initial sales were not catalog sales at all but were direct sales to large customers of Schiller. that *père* Ryback took with him—perfectly lawfully—when he left to join his son.

■ For years we have been saying, without much visible effect, that people who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence. *Patton v. Mid–Continent Systems, Inc.*, 841 F.2d 742, 748 (7th Cir. 1988), and cases cited there; *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1165 (7th Cir.1987). *Post hoc ergo propter hoc* will not do; nor the enduing of simplistic extrapolation and childish arithmetic with the appearance of authority by hiring a professor to mouth damages theories that make a joke of the concept of expert knowledge. The expert should have tried to separate the damages that resulted from the lawful entry of a powerful competitor—Nordisco—from the damages that re-

sulted from particular forms of misconduct allegedly committed by that competitor, of which the theft of the mailing list, however morally reprehensible, was the slightest. No such effort was made.

The appeal raises several other issues but they are patently without merit and do not require discussion. We find no error except the absence of findings with respect to the issue of infringement of the copyrighted layouts in Schiller's catalog.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH DIRECTIONS.

# FIGURE 1

## DUOTANG REPORT COVERS

(A) (B) (C)

Popular Duotang report covers at low prices. Style (A) has 2 convenient pockets. Style (B) & (C) have built in metal fasteners to hold up to 100 sheets of 11x8½" 3 hole punched material. Style (B) has an embossed front with label area. Style (C) has a clear acetate front.

| Order No. | Style | Priced Per Each | | | | |
|---|---|---|---|---|---|---|
| | | 1Ea | 25Ea | 100Ea | 250Ea | 500Ea |
| (A) 50-125* | Double Pocket | .32 | .28 | .25 | .24 | .23 |
| (B) 5-1258* | Embossed Front | .37 | .32 | .31 | .30 | .29 |
| (C) 5-3540* | Clear Front | .74 | .67 | .62 | .59 | .55 |

*Add color suffix. Style (A) & (B) available in: Lt. Blue—20; Dk. Blue—23; Tan—44; Red—58; Green—60; Yellow—70; or Orange—80. Style (C) available: Black—05; White—10; Dk. Blue—23 or Red—58.

S&S

## DUO-TANG REPORT COVERS

Style (A) is a pocket style cover with twin pockets inside the covers. Styles (B) and (C) both have built in fastners to hold up to 100 sheets of 11x8½" 3-hole punched material. Style (B) has an embossed border with label area. Style (C) has a clear acetate front.

| Order No. | Style | Per Each | Priced Per Box of 25 | | | |
|---|---|---|---|---|---|---|
| | | | 1 Bx. | 4 Bx. | 10 Bx. | 20 Bx. |
| (A) 50-125-* | Double Pocket | .29 | $6.98 | 6.19 | 5.97 | 5.64 |
| (B) 5-1258-* | Embossed Front | .37 | 7.95 | 7.50 | 7.21 | 6.85 |
| (C) 5-3540-* | Clear Front | .74 | 16.71 | 15.71 | 14.16 | 13.75 |

*Specify Color: (A) and (B) Available in: Lt Blue-20; Dk Blue-23; Tan-44; Red-58; Green-60; Yellow-70. (C) Available in: Black-05; White-10; Dk. Blue-23; or Red-58.

Nordisco

418

**FIGURE 2**

Quill

Modern

Wallace

Betsy

Robt. James

Reliable

Viking

419

# FIGURE 3

Nordisco

S&S

420

FIGURE 4

