**GLOVAROMA, INC., a California corporation, the Zappa Family Trust, by Gail Zappa, trustee, and Gail Zappa, an individual, Plaintiffs,**

v.

**MALJACK PRODUCTIONS, INC., an Illinois corporation, d/b/a MPI Home Video, Defendant.**

No. 96 C 3985.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 23, 1999.

848

George N. Vurdelja, Jr., Griswold L. Ware, John M. Heaphy, Jr., Vurdelja & Heaphy, Chicago, IL, for Zappa Family Trust, by Gail Zappa Trustee, Glovaroma, Inc., Gail Zappa, Plaintiffs.

David Galbreath Larmore, Ungaretti & Harris, Chicago, IL, John L. Leonard, Jennifer Ann Lazewski, Defrees & Fiske, Chicago, IL, David A. Gerber, D. Gerber Law Offices, Oxnard, CA, for Maljack Productions, Inc.

## MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

Plaintiffs Glovaroma, Inc. ("Glovaroma"), the Zappa Family Trust (the "Trust"), and Gail Zappa allege that Maljack Productions, Inc. ("MPI") violated the Copyright Act, 17 U.S.C. §§ 101–1332, and the Trademark Act, 15 U.S.C. §§ 1051–1127. Plaintiffs also have a claim for an accounting. Both parties now move the court for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the court denies plaintiffs' motion for summary judgment but grants defendant's motion for summary judgment in part and denies it in part.

### Background

The late Frank Zappa was a legendary rock-and-roll music icon who created many musical works using both audio and video mediums. Since Frank Zappa's death, his widow Gail Zappa has controlled the rights to her deceased husband's creative works through Glovaroma and the Trust. Glovaroma creates and produces videotapes of Frank Zappa's creative works under the registered trademark "Honker Home Video." Gail Zappa owns the right to use Frank Zappa's name, voice, photograph, and likeness as a successor-in-interest. Defendant MPI, an Illinois corporation, is in the business of licensing and distributing video products.

In December 1987, Gail Zappa and MPI reached an oral agreement that gave MPI the right to produce and distribute five Frank Zappa videos under the Honker Home Video trademark label. The videos that are part of this dispute are "Baby Snakes," "Uncle Meat," "Video From Hell," "The True Story of Frank Zappa's 200 Motels," and "The Amazing Mr. Bickford" (the "Videos"). Pursuant to this agreement, MPI had a license to manufacture, rent, sublease, advertise, and market copies of these Videos in the United States. In 1987, MPI began distributing four of the Videos. Early in 1990, MPI began distributing the fifth video.

At Gail Zappa's request, an accounting firm reviewed MPI's financial records and

determined that MPI was under-reporting sales of the Videos and miscalculating royalty payments. In May 1994, Gail Zappa demanded that MPI return all videos, advertising, and promotional materials belonging to Glovaroma; destroy all Zappa video inventory in MPI's possession; and provide an affidavit to that effect. MPI neither provided an affidavit nor remitted payment. Furthermore, MPI continued to sell-off its existing inventory. (Def.'s 12(M) ¶ 18.) MPI did not, however, duplicate any more Videos or video sleeves. (Def.'s 12(M) ¶ 18.)

The copyright registration certificates for the Videos identify Frank Zappa as the author of the new matter. His personal efforts, which were not as "work made for hire," include editing, new lyrics and music, writing, producing, and directing. (Gerber Decl. Exs. O, Q, S, U, W.) The certificates identify part of the new matter as "work made for hire." (Def.'s 12(M) ¶ 4.) MPI contends that no written "work made for hire" agreements exist for the Videos.

The registration certificates for the video sleeves accompanying the videos "Baby Snakes," "Uncle Meat," "Video From Hell," and "The True Story of Frank Zappa's 200 Motels" (the "Four Sleeves") identify Honker Home Video as the author and describe the work as "work made for hire." (Def.'s 12(M) ¶¶ 6–7.) Frank Zappa created the Four Sleeves with help from Greg Gorman, Cal Schenkel, and perhaps others. (G. Zappa Dep. 149–55.) Frank Zappa's personal efforts included graphic design and art direction. (*Id.*)

Glovaroma does business as Honker Home Video. (Def.'s 12(M) ¶ 8.) Glovaroma had no employees who designed the Four Sleeves. (Def.'s 12(M) ¶ 9.) Furthermore, MPI claims that no written "work made for hire" agreements exist for the Four Sleeves. (Def.'s 12(M) ¶¶ 5, 10.)

The copyright registration certificate for "The Amazing Mr. Bickford" video sleeve (the "Bickford sleeve") identifies Cal Schenkel as the author. (Def.'s 12(M) ¶ 11.) The registration certificate further states that Schenkel transferred copyright ownership of the Bickford sleeve to Frank Zappa "by agreement." (Def.'s 12(M) ¶ 12.) MPI claims, however, that no written agreement regarding the transfer of copyright ownership exists between Schenkel and Frank Zappa. (Def.'s 12(M) ¶ 13.) In 1993, Frank and Gail Zappa reached a written assignment agreement and transferred their ownership of all tangible and intangible property to the Zappa Family Trust. (Plaintiffs.' Resp. Ex. D.)

With respect to the trademark infringement claim, MPI contends that it never signed an agreement that inured its use of the Honker Video label to Glovaroma's benefit. (Def.'s 12(M) ¶ 22.) Therefore, MPI claims that it is the owner of the Honker Home Video label because it initiated the use of the trademark in commerce. (Def.'s 12(M) ¶ 20.) Moreover, MPI only used the Honker Home Video label after May 1994 to sell its existing inventory. (Def.'s 12(M) ¶ 23.) Finally, MPI contends that Gail Zappa's objection to the royalty report in April 1989 demonstrates her earliest knowledge of the alleged under-reporting. (Def.'s 12(M) ¶ 24.)

### *Analysis*

Both parties move the court to enter summary judgment on their behalf under Rule 56 of the Federal Rules of Civil Procedure. The court will render summary judgment only if the factual record shows "that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 173 (7th Cir.1996) (quoting Fed. R.Civ.P. 56(c)). The court will not render summary judgment if "a reasonable jury could return a verdict for the nonmoving party." *Sullivan v. Cox*, 78 F.3d 322, 325 (7th Cir.1996) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct.

2505, 91 L.Ed.2d 202 (1986)). In ruling on a motion for summary judgment, the court views the facts in the light most favorable to the nonmoving party. *See Bratton,* 77 F.3d at 171 (citation omitted); *Sullivan,* 78 F.3d at 325 (citation omitted).

On a motion for summary judgment, the moving party "bears the initial burden of showing that no genuine issue of material fact exists." *Hudson Ins. Co. v. City of Chicago Heights,* 48 F.3d 234, 237 (7th Cir.1995) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Then the burden shifts to the nonmoving party, which "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord NLFC, Inc. v. Devcom Mid-America, Inc.,* 45 F.3d 231, 234 (7th Cir. 1995) (citations omitted).

These burdens are reflected in Rule 12 of the Local General Rules for the Northern District of Illinois. *See Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921–22 (7th Cir.1994). Under Rule 12(M)(3), the moving party must submit a statement of material facts in the form of short numbered paragraphs supported by specific references to the factual record. Under Rule 12(N)(3), the nonmoving party must submit a response to each such paragraph, including (in the case of disagreement) specific references to the factual record.[1] If the nonmoving party fails to disagree with a fact in the moving party's 12(M) statement, the court will deem that fact admitted. *See* Local Rule 12(N)(3). Similarly, if the nonmoving party disagrees with a fact in the moving party's statement but fails to support its disagreement with a specific reference to the factual record, the court may deem that fact admitted as well. *See* Fed.R.Civ.P. 56(e); *Flaherty v. Gas Research Institute,* 31 F.3d 451, 453 (7th Cir.1994) (citations omitted). The Seventh Circuit Court of Appeals has "repeatedly upheld the strict enforcement of these rules." *Waldridge,* 24 F.3d at 922; *see also, e.g., Knoblauch v. DEF Express Corporation,* 86 F.3d 684, 690 (7th Cir.1996).

## I. Copyright Infringement

### A. The Video Sleeves

■ To establish copyright infringement, plaintiffs' must prove that they own the copyrights and that defendant copied the "constituent elements of the work that are original." *See Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Generally, plaintiffs can prove ownership by a copyright registration. *See* 17 U.S.C. § 401(c). Under the Copyright Act (the "Act"), copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). "As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). The Copyright Act, however, creates an exception for "works made for hire." 17 U.S.C. § 201(b).

In a "work made for hire," the "author" and initial owner of the copyright is not the creator of the work but the employer or the party that commissioned the work. Section 201(b) provides:

> In the case of work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all the rights comprised in the copyright.

---

1. Rule 12(N)(3) further instructs the nonmoving party to submit a statement of any additional facts requiring denial of summary judgment, in the form of short numbered paragraphs supported by specific references to the factual record. In turn, Rule 12(M)(3) instructs the moving party to submit a concise reply to any such additional facts, including (in the case of disagreement) specific references to the record.

*Id.* Section 101 defines a "work made for hire" as:

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that work shall be considered a work made for hire.

17 U.S.C. § 101.

■ The two parts of this test are mutually exclusive. Specifically, the first paragraph of section 101 applies to works created by employees, and the second applies to works created by independent contractors. *See Community for Creative Non–Violence,* 490 U.S. at 742–43, 109 S.Ct. 2166. The *CCNV* Court held that "employee" and "employer" in section 101(a) narrowly describes the traditional agency view of the employer-employee relationship. MPI has challenged Glovaroma's valid ownership of the video sleeves for "Baby Snakes," "Uncle Meat," "Video From Hell," and "The True Story of Frank Zappa's 200 Motels," (the "Four Sleeves"). The copyright registration identifies the author of these video sleeves as Honker Home Video and states that the sleeves were "works made for hire." (Gerber Decl. Exs. R, T, V, X.) Glovaroma is doing business as Honker Home Video. (Def.'s 12(M) ¶ 8.) Therefore, Glovaroma must present evidence that it either (1) hired employees who created the video sleeves or (2) commissioned an independent contractor, pursuant to a written agreement, to create the video sleeves.

MPI contends that Glovaroma had no employees who designed video sleeves. (Def.'s 12(M) ¶ 9). In their response, plaintiffs contend that this statement is a misinterpretation of Gail Zappa's testimony. Gail Zappa testified that Frank Zappa created video sleeves in association with Glovaroma, but she did not know whether this was done in an employment relationship. (Plaintiffs.' 12(N) ¶ 9.)

Under Local Rule 12(N)(3), a party opposing summary judgment must serve and file "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." If the nonmoving party fails to comply with this requirement, the court will deem that fact admitted.

Glovaroma, through its failure to provide any affidavits or deposition testimony that would create a genuine factual issue whether Frank Zappa and Glovaroma were in an employment relationship, has failed to meet its burden under Local Rule 12(N)(3). Gail Zappa's uncertainty regarding the relationship between the two parties is an insufficient denial under the requirements of Local Rule 12(N). Thus, for purposes of this motion, the court assumes that Glovaroma had no employees who designed the sleeves.

■ Consequently, Glovaroma could only have obtained ownership of the Four Sleeves if it commissioned an independent contractor. A work created by an independent contractor can constitute a "work made for hire" only if it fits one of the nine narrowly drawn categories of works, and then only by compliance with the writing requirement. *See Community for Creative Non–Violence,* 490 U.S. at 748, 109 S.Ct. 2166; *see also* 17 U.S.C. § 101. One of these categories is a "supplemental work."

Section 101 describes a supplementary work as:

*a work prepared for publication as a secondary adjunct to a work by another author for the purpose of* introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in

the use of the other work, such as forewords, afterwords, *pictorial illustrations,* maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" in a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

17 U.S.C. § 101 (emphasis added). The copyright registrations describe these Four Sleeves as artwork or cover photographs. (Gerber Decl. Exs. R, T, V, X.) Clearly, the Four Sleeves are supplementary works.

Glovaroma must also produce, however, a written agreement between Frank Zappa and Glovaroma that expressly states that Frank Zappa's work on the Four Sleeves was considered "work made for hire." In *Schiller & Schmidt, Inc., v. Nordisco Corp.,* 969 F.2d 410, 412 (7th Cir.1992), Judge Posner stated that the requirement of a written statement for specially commissioned works not only serves to protect people against false claims of oral agreements but also ensures the goal of defining ownership rights in intellectual property so that such property will be readily marketable. Furthermore, the written execution must occur before the creation of the work. *See id.*

MPI contends that no written "work made for hire" agreements exist between Glovaroma and Frank Zappa for the four video sleeves. (Def.'s 12(M) ¶ 10.) In response, Glovaroma states that "Gail Zappa is not necessarily the person with the most knowledge of the subject, and Defendant has not shown for purposes of summary judgment that the agreements do not exist." (Def.'s 12(M) ¶ 10.)

While MPI bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the deposition that it believes demonstrate the absence of a genuine issue of material fact, MPI does not have to prove affirmatively the nonexistence of a written "work made for hire" agreement. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *see also* Fed.R.Civ.P. 56. Therefore, Gail Zappa's deposition testimony satisfies MPI's initial burden that no written "work made for hire" agreements existed between Glovaroma and Frank Zappa. (G. Zappa Dep. p. 155.)

Specifically, Gail Zappa was uncertain of whether a "work made for hire" agreement or copyright assignment existed and, moreover, which video or video sleeve it covered. Because of this uncertainty, Glovaroma must provide evidence from a party with actual knowledge of an agreement or assignment to create a genuine issue of material fact. Glovaroma's 12(N) response fails to meet this burden. Therefore, for the purposes of this summary judgment motion, Glovaroma is not the author of, and is not entitled to enforce, the copyright for the Four Sleeves.

Because no written "work made for hire" agreements exist for the Four Sleeves, the creator of the works is the rightful owner of the video sleeves. *See Schiller & Schmidt,* 969 F.2d at 413 ("The creator of the property is the owner, unless he is an employee creating the property within the scope of his employment or the parties have agreed in a writing signed by both that the person who commissioned the creation of the property is the owner."). The issue then becomes who created the Four Sleeves?

▮▮ Per Gail Zappa's uncontroverted testimony, Frank Zappa created the Four Sleeves with help from Greg Gorman, Cal Schenkel, and perhaps others. (G. Zappa Dep. 149–55.) According to section 101 of the Copyright Act, "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole" is a "joint work." A contributor is not considered an "author," and does not gain a co-owner copyright interest, unless her contribution, standing alone, is copyrightable. *See Erickson v.*

*Trinity Theatre, Inc.*, 13 F.3d 1061, 1070 (7th Cir.1994). From Gail Zappa's uncontroverted testimony, Frank Zappa was a graphic artist, a designer, and the art director for the Four Sleeves. Therefore, his efforts were more than de minimis and he is the creator, or one of the creators, for each of the Four Sleeves.

■ In a joint work, each of the authors is an owner of the work as a tenant in common. *See Picture Music, Inc. v. Bourne, Inc.*, 314 F.Supp. 640, 646 (S.D.N.Y.1970), *aff'd*, 457 F.2d 1213 (2d Cir.1972). Absent an agreement to the contrary, each author has an undivided interest in the work. Furthermore, the joint owner cannot assign the work or grant an exclusive license without the written consent of the other co-owners. *See* 17 U.S.C. § 204(a). A co-owner can, however, transfer his undivided interest in the work. Therefore, whether Frank Zappa was the sole creator or a co-owner of the Four Sleeves, he could transfer his copyright interest.

■ Consequently, the issue becomes whether Frank Zappa transferred his ownership interest in the Four Sleeves to the Zappa Family Trust (the "Trust"). Under the Copyright Act, "[a] transfer of copyright ownership other than by operation of law is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a).

In April 1993, Frank and Gail Zappa transferred their individual rights to all tangible and intangible property to the Trust. The written transfer of ownership includes "any copyrights and all renewals and extensions thereof, [and] any trademarks and service marks, applications and registrations therefor." (Plaintiffs' Resp. Ex. D.) The plain meaning of this conveyance satisfies the section 204(a) writing requirement. Therefore, the Trust is, at a minimum, a co-owner in the Four Sleeves

and is, therefore, entitled to bring a copyright infringement action.

*B. The "The Amazing Mr. Bickford" video sleeve*

■ As noted above, transfer of copyright ownership requires a signed agreement between the parties. *See* 17 U.S.C. § 204(a). The copyright certificate for "The Amazing Mr. Bickford" sleeve (the "Bickford sleeve") identifies Cal Schenkel as the author. (Gerber Decl. Ex. P.) Moreover, the certificate states that Schenkel transferred copyright ownership to Frank Zappa "by agreement." MPI contends that no written agreement exists to transfer the Bickford sleeve copyright from Schenkel to Frank Zappa. (Def.'s 12(M) ¶ 13.) Plaintiffs respond that MPI has not shown that no written agreement exists and that "the only evidence in the matter to date is the deposition of Gail Zappa, who simply does not know whether the agreements exist."

Defendant does not have to prove affirmatively the nonexistence of purported evidence to satisfy summary judgment requirements; the court has already ruled that plaintiffs' argument is deficient for purposes of summary judgment. Consequently, the Trust can only obtain ownership of the Bickford sleeve if the court finds that the mere filing of a certificate of registration containing the "assignment" language is prima facie evidence of the Trust's copyright ownership.

The Copyright Act provides:
In any judicial proceedings the certificate of registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright *and of the facts stated in the certificate.* The evidentiary weight to be accorded the certificate of the registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c) (emphasis added). The registration certificate for the Bickford sleeve satisfies this five-year requirement.

The work was first published on May 15, 1989, and Frank Zappa registered the copyright on December 6, 1993. (Gerber Decl. Ex. P.) The certificate names Frank Zappa as the copyright owner by assignment from Schenkel.

Therefore, plaintiffs have created a rebuttable presumption that Frank Zappa was the owner of the Bickford sleeve copyright on or before December 6, 1993. Although defendant has questioned whether any assignment from Schenkel to Zappa in fact exists, defendant has not introduced any factual evidence to counter the registration certificate. Consequently, for purposes of this motion for summary judgment, Frank Zappa owned the Bickford sleeve copyright and properly transferred it to the Trust under the April 9, 1993 agreement. (Plaintiffs. Resp. Ex. D (stating that the transfer of copyrights from Frank Zappa to the Trust includes those "hereafter acquired"); *see also* Gerber Decl. Ex. N (recording the transfer of the Bickford sleeve from Frank Zappa to the Trust).)

### C. The Five Videos

■ MPI also challenges Plaintiffs ownership of the "Baby Snakes," "Uncle Meat," "Video From Hell," "The True Story of Frank Zappa's 200 Motels," and "The Amazing Mr. Bickford" videos (the "Videos"). As noted above, a work created by an independent contractor can constitute a "work made for hire" only if it fits one of the nine narrowly drawn categories of works in Section 101, and then only by compliance with the writing requirement. *See Community for Creative Non-Violence*, 490 U.S. at 748, 109 S.Ct. 2166. One of the categories is "audiovisual work"; the Videos fit into this category.

With respect to whether the writing requirement of Section 101 is satisfied, the copyright registration certificate for each video recites that it consists of preexisting matter and new matter. (Gerber Decl. Exs. O, Q, S, U, W.) The certificates also state that Frank Zappa is the author of the new matter and identifies the new matter as "work made for hire." MPI contends that no written "work made for hire" agreements exists for any of the five videos. Plaintiffs respond that MPI has not shown that no written agreement exists and that "the only evidence in the matter to date is the deposition of Gail Zappa, who simply does not know whether the agreements exist." As the court ruled above, plaintiffs' response does not create a genuine issue of material fact. Therefore, the Videos are not "works made for hire," and their creator is the copyright owner. *See Schiller & Schmidt*, 969 F.2d at 413.

Frank Zappa was, at a minimum, a joint author of the new matter in these Videos. The registration certificates state that part of Frank Zappa's contribution to the Videos was *not* a "work made for hire." His personal efforts included editing, new lyrics and music, writing, producing, and directing. Three of the five certificates were registered within five years of the first publication of the work. Therefore, per section 410(c), the certificates are prima facie evidence of the validity of the copyrights and the facts stated on the certificates. The other two certificates, for "Video from Hell" and "Uncle Meat," were registered within seven years of first publication. Because defendant has adduced no facts to contravene Frank Zappa's contributions to these two videos, the court, in its 410(c) discretion, accepts the certificates as prima facie evidence of the facts stated thereon. Consequently, for purposes of this motion for summary judgment, the court finds that Frank Zappa owned, or jointly owned, the copyrights for the Videos and properly transferred them, or his interest in them, to the Trust under the April 9, 1993 agreement. Therefore, the Trust has the right to bring a copyright infringement action for the Videos.

### D. Infringement

Having established that the Trust is entitled to sue for infringement of the sleeve

and the video copyrights, the next issue is whether MPI infringed the copyrights by "selling-off" its existing inventory after Gail Zappa revoked their oral agreement. Under 17 U.S.C. § 106(3), the copyright owner has the exclusive right "to distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership or by rental, lease or lending." Moreover, the copyright owner has the authority to transfer its exclusive rights, subject to a writing requirement. Section 204(a) provides that an exclusive license "is not valid unless an instrument of conveyance or note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed." This provision protects copyright holders from persons who mistakenly or fraudulently claim oral licenses. Furthermore, this provision allows licensees to defend themselves against copyright infringement actions.

Plaintiffs contend that their licensing agreement with MPI is not enforceable because no written agreement exists that grants defendant an exclusive right to copy and distribute their works. MPI argues that because plaintiffs permitted MPI to manufacture the videos and video sleeves, MPI was entitled to sell-off its existing inventory after Gail Zappa rescinded the oral license.

A copyright holder can grant an implied nonexclusive license through conduct or an oral agreement. *See I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996). A nonexclusive license does not transfer copyright ownership to the licensee but does grant the licensee the right to use the copyrighted work. *See id.*

A nonexclusive license is, therefore, an exception to the writing requirement of section 204. In fact, consent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license and is not required to be in writing. Although a person holding a nonexclusive license has no standing to sue for copyright infringement, the existence of a license, exclusive or nonexclusive, creates an affirmative defense to a claim of copyright infringement.

*Id.* (citations omitted).

The *I.A.E.* court suggests several objective factors to use when evaluating whether an implied license exists: the copyright registration certificate language, any written agreements between the parties, deposition testimony, and "the delivery of the copyrighted material without warning that its further use would constitute copyright infringement." *See id.* at 776. In *I.A.E.*, the registration certificates stated that the copyrighted designs were to be used for a particular purpose. *See id.* No such restrictions exist on the Videos or sleeve certificates; therefore, defendant was not under notice that it exceeding the purpose of the copyrights when it duplicated and distributed the videos.

Furthermore, both parties agree that MPI had a license to manufacture and distribute plaintiffs' works until around May 9, 1994. (Second Am. Compl. ¶¶ 11–14; Def.'s 12(M) ¶ 15.) Furthermore, on January 15, 1991, Gail Zappa wrote defendant, "isn't it time to redo our 'deal'." (Def.'s 12(M) Ex. L.) Although this memorandum lacks the term "transfer" or "copyright," the minimum requirement is merely "a mutual intent to transfer the copyright interests." M. & D. Nimmer, *Nimmer on Copyrights* § 10.03[A][2], p. 10–37 (1997). Therefore, the court finds that a nonexclusive license existed until on or about May 9, 1994.[2]

2. In an earlier opinion on defendant's motion to dismiss, *Glovaroma, Inc. v. Maljack Prods., Inc.*, No. 96 C 3985, 1998 WL 102742 (N.D.Ill. Feb.26, 1998), this court ruled that defendant did not have an exclusive license, as alleged in the complaint, because it was not in writing. In this motion for summary judgment, however, the court looks past the face of the pleading and finds, based on the facts presented, that plaintiffs gave defendant an implied nonexclusive license to manufacture and distribute the videos.

Furthermore, the Seventh Circuit's opinion in *I.A.E.* did not restrict implied licenses to

■ Both parties acknowledge that defendant did not duplicate the videos or the sleeves after plaintiffs canceled the license. (Def.'s 12(M) ¶ 17.) Moreover, they agree that after this date defendant sold its remaining inventory. (*Id.* ¶ 18.) The issue before the court is whether these final sales constitute a copyright infringement. The record is not clear about what agreements the parties had before May 9, 1994. For example, the court does not know whether their agreement contained a termination date or not. Furthermore, the court does not know if the parties had an agreement about how to wrap up business after the termination.[3] Therefore, the extent of the infringement, if any, is a matter to be left to the jury. Accordingly, the court denies both parties' motions for summary judgment on the copyright infringement claim.

## II. The Trademark Infringement Claim

Plaintiffs allege in Count V that defendant continued to use the trademark "Honker Home Video" after plaintiffs requested the defendant to cease distribution of the Zappa videos under the Honker label. According to the Trademark Act,

> [a]ny person who shall, without consent of the registrant, use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods ... [where] such use is likely to cause confusion ... shall be liable in a civil action to the registrant.

15 U.S.C. § 1114(1). Plaintiffs' alleged ownership of the trademark is based on their registration of the label in February 1988. (Plaintiffs.' 12(M) ¶ 4.)

the facts given in *Effects Assocs., Inc. v. Cohen,* 908 F.2d 555 (9th Cir.1990), as this court's earlier opinion may have implied. *See Glovaroma,* 1998 WL 102742, at *2. On the contrary, *I.A.E.* was using the *Effects* facts as an example of a situation where implied non-exclusive licenses apply. *See I.A.E.,* 74 F.3d at 776.

■ A trademark is infringed when an unauthorized party creates consumer confusion by using a similar mark on similar goods. However, "[t]rademark law generally does not reach the sale of genuine goods bearing a true mark even though such sale was without the owner's consent." *Weil Ceramics & Glass, Inc. v. Dash,* 878 F.2d 659, 671 (3d Cir.1989). Furthermore, no claim for infringement is generally found where plaintiff authorized the defendant to use the mark. *See Genin, Trudeau & Co. v. Integra Dev. Int'l,* 845 F.Supp. 611 (N.D.Ill.1994). Thus, where defendant continued to sell product bearing plaintiff's trademark even after plaintiff canceled their agreement, defendant was not found liable for trademark infringement. *See Advanced Sports Concepts, Inc. v. Baden Sports Inc.,* 29 U.S.P.Q.2d 1227, 1229–30, 1993 WL 592529 (S.D.Ohio 1993). And, where defendant's products bearing the mark were genuine and qualitatively equivalent to those produced by plaintiff, no infringement was found because "there is no likelihood of confusion or loss of good will." *Genin,* 845 F.Supp. at 615–16.

■ Plaintiffs argue that they own the Honker Home Video Mark because they registered it on February 2, 1988. (Plaintiffs.' Resp. Ex. C.) Defendant responds that it owns the mark because it initiated use of the mark. (Ali Decl. ¶ 6.) Despite which party owns the Honker Home Video mark, "there is no likelihood of confusion" from MPI's continued use of the mark after plaintiffs canceled the license. Plaintiffs have not met their burden of satisfying the prima facie case for infringement; they adduced no evidence showing any consumer confusion over the Honker mark after May 9, 1994. The inventory that

3. Plaintiffs' complaint stated that on May 9, 1994 their attorney had demanded that defendant destroy all Zappa video inventory and cease distribution of the videos. Plaintiffs have not, however, provided a copy of any correspondence or any other evidence that such a conversation took place.

defendant sold after the license lapsed was identical to the inventory produced and sold before May 9, 1994. The videos sold with the mark after May 9 were genuine; consumers are not going to be confused by seeing the mark on a Zappa video sold after May 9. The mark was not diminished by having the rest of defendants inventory sold after May 9. Therefore, the court finds that defendant did not create any consumer confusion by continuing to sell its Honker Home Video inventory after May 9, 1994. Consequently, the court does not have to determine who, in fact, owns the Honker mark. The court grants defendant's motion for summary judgment and dismisses plaintiffs' claim for trademark infringement.

### III. Plaintiffs' Claim for Accounting

MPI argues that the court should grant it summary judgment on plaintiffs' accounting claim. Specifically, MPI claims that the court lacks equity jurisdiction over the claim, that there is no federal jurisdiction over the claim as it seeks no monetary relief, and that the applicable statute of limitations has time-barred the claim.

 The existence of an account, or the fact that an accounting is necessary, does not confer equitable jurisdiction. *See Webster v. Hall*, 388 Ill. 401, 58 N.E.2d 575 (1944). An accounting claim is improper without a specific, recognized factual predicate. Plaintiffs allege that the factual predicate in the instant case is that the accounts involved are "complex." MPI contends that this issue is not complex and points to plaintiffs' expert testimony that only three issues exist. Moreover, the expert's audit report fully explains the issues in four pages. Consequently, MPI argues that the accounting is not so complex that a jury could not understand it. Plaintiffs admit to the statements regarding their expert's testimony and fail to even discuss the issue in their Response and Cross–Motion for Summary Judgment.

Plaintiffs failed to address this issue. Moreover, even looking in a light most favorable to plaintiffs, the fact that plaintiffs' expert identified only three issues and fully discussed those issues demonstrates that the factual predicate, upon which plaintiffs base the accounting claim, is baseless.

The accounting claim must also fail as it is beyond the applicable statute of limitations. Specifically, Illinois applies a five-year limitation to an accounting claim. *See Kedzierski v. Kedzierski*, 899 F.2d 681, 682 (7th Cir.1990). Gail Zappa first became aware of the accounting claim on April 1989 when she first protested MPI's first royalty report. Again, Plaintiffs' counsel does not even address this issue in its Response and Cross–Motion for Summary Judgment. As a result, the court grants MPI's motion for summary judgment and dismisses plaintiffs' accounting claim.

### Conclusion

The court grants in part and denies in part MPI's motion for summary judgment. Specifically, the court grants MPI's motion for summary judgment on the trademark infringement and accounting claims. The court denies MPI's motion for summary judgment on the copyright infringement claim. Plaintiffs' motion for summary judgment is denied. The parties should discuss settlement before the next court date.