In the

# United States Court of Appeals
### For the Seventh Circuit

No. 02-1069

ITOFCA, INC.,

*Plaintiff-Appellant,*

v.

MEGATRANS LOGISTICS, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 2087—**Ruben Castillo**, *Judge.*

ARGUED OCTOBER 15, 2002—DECIDED MARCH 7, 2003

Before POSNER, RIPPLE, and KANNE, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff, ITOFCA, appeals from the grant of summary judgment to the defendant, MegaTrans, in a suit for copyright infringement. ITOFCA claims to be the owner of the copyright on a computer software program. MegaTrans owns the program itself, claims to have obtained the copyright in a bankruptcy sale, and is making and selling copies of a modified version of the program. The modified program is a derivative work, and so if ITOFCA owns the copyright on the original, MegaTrans cannot sell its version without a license, 17 U.S.C. § 106(2), which it does not have, from ITOFCA.

ITOFCA was in 1986 a cooperative corporation owned by Ford, Walgreen, and other large corporations to which it provided rail and truck freight consolidation and forwarding services. It had developed a computer program called the "Comprehensive Intermodal Program" to help its member-owners with their shipping. It undoubtedly owned the copyright on the program, though it hadn't registered the copyright; registration is no longer required for a valid copyright. In 1986 it transferred most of its assets to a new entity, ITOFCA Consolidators, Inc. (ICI). The asset agreement recites that "the membership of ITOFCA desires to divest ITOFCA of all assets and operations involving freight forwarding services" and specifically "desires to transfer all of its assets, except a building at [address] and cash assets of ITOFCA to ICI." Among the "assets" transferred to ICI (which despite its name was not owned by or otherwise affiliated with ITOFCA) was the employee of ITOFCA, a man named Fowler, who had developed the Comprehensive Intermodal Program.

Five years later, ICI found itself in Chapter 11. The bankruptcy court, with no opposition from ITOFCA (which participated in the Chapter 11 proceeding), approved the sale to a company called Amerifreight of ICI's "right, title and interest in all patent, copyright and trade secret rights in and to all computer software and corresponding documentation developed or acquired by [ICI] . . . . Amerifreight expressly acknowledges that [ICI] may sell additional copies of the Software to other parties and that by virtue of the proposed assignment it has only a non-exclusive right to the Software." Amerifreight turned around and assigned all the rights it had acquired from ICI to MegaTrans. Fowler, now employed by MegaTrans, modified the software program, which MegaTrans then licensed to others. That was in 1991. Eight years later,

ITOFCA, dormant since the transfer of its operating assets to ICI, woke up and registered copyright on what it described as a "comprehensive intermodal program" that had been developed in 1989. Later it filed a supplemental registration stating that the program had been created in 1991 and listing ICI as a co-author and hence as a copyright owner, but asserting that ITOFCA was the owner of the original program, which had been developed in 1986. ITOFCA was thus conceding that ICI was authorized to modify the original program, see 17 U.S.C. § 117(a)(1), but only, as the statute makes clear, for ICI's own use, and not to sell copies of the modified work. 17 U.S.C. § 117(b); *Aymes v. Bonelli*, 47 F.3d 23, 25-27 (2d Cir. 1995); *Foresight Resources Corp. v. Pfortmiller*, 719 F. Supp. 1006, 1009-10 (D. Kan. 1989). The distinction is consistent with the general principle of copyright law that a license to prepare a derivative work does not authorize the preparer to sell copies of it. Making and selling are distinct rights, 17 U.S.C. §§ 106(1), (2), and you can assign one without the other. See *Gracen v. Bradford Exchange*, 698 F.2d 300, 302-03 (7th Cir. 1983).

When a bankruptcy court approves the sale of an asset of the debtor, a person who has notice of the sale cannot later void it on the ground that he is the asset's real owner. *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 908 (7th Cir. 1990); *In re Met-L-Wood Corp.*, 861 F.2d 1012, 1016 (7th Cir. 1988); *Veltman v. Whetzal*, 93 F.3d 517, 520-21 (8th Cir. 1996); see also *In re Edwards*, 962 F.2d 641, 643-44 (7th Cir. 1992). That was the ground on which the district judge rejected ITOFCA's claim of copyright infringement. ITOFCA argues that all the sale did was transfer whatever copyright interest ICI had, and the only interest it had was a license to use the copyrighted program that had been transferred to it by ITOFCA when ICI was created. The terms of the bankruptcy court's

order approving the sale refute this interpretation. The order states that ICI is free to sell additional copies of the software; this implies, since ICI was conveying its rights to Amerifreight, that Amerifreight too, and hence its transferee, MegaTrans, was free to sell copies. So ICI and its transferees must have had more than a license to use the software, since a copyright licensee has no right to make further copies (except a single, back-up copy for his own use): the purchaser of a book does not obtain the right to make copies of the book.

In the same order, ICI conveyed its software rights to a second company as well as to Amerifreight (namely Southern Pacific), which it could not do without making a copy; to repeat, a mere copyright licensee is permitted only to make a single copy, and that for his own use only, not for sale to another. There is a further significance to this second sale; it helps explain why the grant to Amerifreight was described as a "nonexclusive" license. It was nonexclusive because another corporation (Southern Pacific) was also sold rights to the software and because ICI retained a right to sell more copies; Amerifreight was not receiving an exclusive right to the software. "Nonexclusive" does not as ITOFCA believes equate to "a copy;" the bankruptcy court would have had no occasion to mention the nonexclusivity of the grant if all that was being conveyed was a copy of the software, since everyone knows that the sale of a copy of a copyrighted work does not convey an exclusive right to the work; the owner of the copyright retains his right to make and sell additional copies to others.

Any doubt about the meaning of "nonexclusive" is dispelled by the exchange over the term between the lawyers and the bankruptcy judge, after the critical passage, elided by ITOFCA in its brief, is restored:

>   [ITOFCA attorney]: And the only other concern that we had is it being a private sale instead of a public sale. Now, we understand that *the software will be held open to a future sale as well.* I just query—

>   Court: What's this, a nonexclusive license that's being sold?

>   [ICI attorney]: That's correct, your Honor.

>   [ITOFCA attorney]: I just query whether there is anything unique about the hardware that should be marketed by a public sale.

The grant was nonexclusive because the software remained salable to others as well as to Amerifreight.

It is true that ICI did not list a copyright among its assets on the asset schedule that it submitted to the bankruptcy court; true, too, that ordinarily persons who might have an interest in property being sold at a bankruptcy auction have a right to rely on the fact that the debtor's schedule of assets does not list the property in which they are interested. But it was apparent on the face of the bankruptcy judge's order that it was conveying the right to sell copies of the modified program—which is precisely the right that ITOFCA claims to have retained for itself. Its failure to object to the bankruptcy court's order is compelling evidence that its claim of right is an afterthought. It knew it had no basis for objecting to the sale order.

The question whether the bankruptcy court's order gave ICI's transferee, Amerifreight, and hence Amerifreight's transferee, MegaTrans, the defendant, the right to make and sell copies of the software is distinct from the question whether what ITOFCA had conveyed to ICI in the asset transfer agreement (which of course preceded the

bankruptcy) was, in fact, the copyright on the software. Probably it was, though this we need not decide, since even if the agreement did not transfer the copyright we have just determined that it transferred a right to sell a modified version, which is all that matters so far as this appeal is concerned.

The copyright on the computer program was an asset of ITOFCA. ITOFCA sold all its assets to ICI except a building and some cash. A copyright is neither a building nor cash. True, the asset transfer agreement also states that ITOFCA desires to "transfer only those assets used and necessary in the operations of the transportation services being transferred," but the copyright is one of those assets; it was used in ITOFCA's "transportation services"; that *was* ITOFCA's business that it exited through the sale to ICI. A possible reply is that since section 117 of the copyright statute entitled ICI to adapt the program for its own use, it didn't need the copyright itself, but just the right that the statute gave it—the right to modify the program for its own use. But the parties do not discuss the possible bearing of section 117.

ITOFCA is right of course that a copyright is not transferred automatically with the transfer of the copyrighted good. When you buy a book, you don't obtain the right to make and sell copies of it. The copyright statute is explicit that there must be a memorandum in writing for the sale of the copyright to be enforceable. 17 U.S.C. §§ 202, 204(a). But it does not follow as ITOFCA believes that the agreement must use the word "copyright." *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir. 1992); *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989); *Shugrue v. Continental Airlines, Inc.*, 977 F. Supp. 280, 284-85 (S.D.N.Y. 1997); *Bieg v. Hovnanian Enterprises, Inc.*, 157 F. Supp. 2d 475, 479-80 (E.D. Pa. 2001); cf. *SAPC,*

*Inc. v. Lotus Development Corp.*, 921 F.2d 360, 362-63 (1st Cir. 1990). It can use terminology such as "all assets" that clearly includes copyrights. *Schiller & Schmidt, Inc. v. Nordisco Corp., supra*, 969 F.2d at 413; *Shugrue v. Continental Airlines, Inc., supra*, 977 F. Supp. at 284-85; *Relational Design & Technology, Inc. v. Brock*, No. 91-2452-EEO, 1993 WL 191323, at *6-7 (D. Kan. May 25, 1993).

We don't want to be literalists, and so are happy to concede that the circumstances may, as in *Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549, 564 (2d Cir. 1995), negate the inference drawn from an acontextual reading. We are doubtful that there any such circumstances here; to repeat an earlier point, the fact that the license granted to Amerifreight and thus to MegaTrends was nonexclusive reserved certain rights to ICI but nothing to ITOFCA. Indeed, as in *Schiller & Schmidt*, where we held that a sale of photographic negatives included the copyright on them, since without it the buyer could not print positives from them, the circumstances in this case reinforce more than they undermine the inference drawn from the language of the transfer agreement. ICI or a successor could not use the Comprehensive Intermodal Program profitably unless it could adapt it to changing technology and the needs of particular customers. ITOFCA acknowledges that the sale to ICI carried with it the right to modify the program; and now suppose that ICI or its successor wanted to license the modified work to a customer. Did it have to get a license from ITOFCA to be allowed to do this? ITOFCA no longer had any technical or sales staff. It was a shell. How would it evaluate such a request? *Who* would evaluate the request? Would ICI have consented to have such an albatross around its neck?

ITOFCA points out that the asset schedule in the Chapter 11 proceeding did not list any copyrights, but asset

schedules are far from infallible and we have seen that
ITOFCA was not entitled to rely on the omission from
the agreement of any reference to the copyright. ITOFCA's
best evidence that the copyright itself was not transferred
is testimony by one of its employees that a lawyer acting
on behalf of Amerifreight (Sullivan, formerly the presi-
dent of ICI) acknowledged at one point that ITOFCA
retained the copyright, and that Fowler acknowledged
that Amerifreight had entered into negotiations with
ITOFCA for a license to make and sell a modified version
because it was unsure whether ITOFCA had transferred
its copyright to ICI. Even if, as we doubt, this evidence
is enough to create a genuine issue of material fact as to
whether the asset transfer agreement transferred the
copyright, in view of the sheer impracticability of such
divided ownership, the preclusive effect of the bank-
ruptcy court's order, which clearly authorized ICI and its
transferees to make and sell a modified version of the
software, requires that the judgment be

AFFIRMED.

RIPPLE, *Circuit Judge*, concurring. The court affirms the district court's grant of summary judgment in this difficult case by holding that ITOFCA's suit for infringement is precluded by the doctrine of claim preclusion under this court's holding in *La Preferida, Inc. v. Cerveceria Modelo, S.A.*, 914 F.2d 900, 908 (7th Cir. 1990). I agree. However, because I believe that this case raises serious concerns about the proper limitations on the use of claim preclusion, I write separately in order to set forth those concerns with some specificity.

## A.

In holding that the bankruptcy court's order bars ITOFCA's claim as a matter of claim preclusion under our holding in *La Preferida*, 914 F.2d at 908, the court writes, "[w]hen a bankruptcy court approves the sale of an asset of the debtor, a person who has notice of the sale cannot later void it on the ground that he is the asset's real owner." Slip op. at 3. This is a correct statement of the law, and, as the court notes, ITOFCA, having had notice of the bankruptcy proceedings is thus bound by the bankruptcy court's order. The difficulty in this case lies in the imprecision of the bankruptcy court's order; it leaves unclear exactly what "asset" ICI was selling. That ambiguity places significant strains on the doctrine of claim preclusion, and we must give serious consideration as to whether those concerns are so weighty as to preclude using that doctrine as the supporting beam on which to rest a judgment in this case.

Claim preclusion is a salutary instrument that "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication."

*Allen v. McCurry*, 449 U.S. 90, 94 (1980). However, these "values of repose and reliance are gained at the expense of denying any opportunity to litigate matters that never have been litigated and that may involve valid rights to relief. The rules of preclusion inevitably have been affected by the resulting desire to achieve a proper balance between foreclosure and a fair opportunity to litigate." Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction and Related Matters § 4415, at 351 (2002). Indeed, claim preclusion must "strike a delicate balance between, on the one hand, the interests of the defendant and of the courts in bringing litigation to a close and, on the other, the interest of the plaintiff in the vindication of a just claim." Restatement (Second) of Judgments § 24 cmt. b. We have stated that "[r]es judicata was not meant to be a trap for the unwary"; it must "ensure fair notice to litigants and . . . yield predictable results." *Andersen v. Chrysler Corp.*, 99 F.3d 846, 852 (7th Cir. 1996).

In order to ensure that the appropriate balance is maintained between these two important policy concerns, the courts have developed various controls on the use of claim preclusion to ensure that its use adequately serves both concerns for judicial efficiency and concerns for fairness to the litigants. Among those controls is the rule that res judicata is an affirmative defense; thus MegaTrans "has the burden of establishing that res judicata . . . ought to bar" ITOFCA's infringement action. *Kulavic v. Chi. & Illinois Midland Ry. Co.*, 1 F.3d 507, 517 (7th Cir. 1993) (noting that "the burden of establishing preclusion is placed on the party claiming it," *id.* at 517 n.6 (internal quotation marks and citations omitted)); *Gleash v. Yuswak*, 308 F.3d 758, 760 (7th Cir. 2002) (noting that claim preclusion is an affirmative defense). When, as here, the issue is decided on summary judgment, the

party with the burden of proof, here MegaTrans, must establish each element of claim preclusion as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Thorsteinsson v. M/V Drangur*, 891 F.2d 1547, 1551 (11th Cir. 1990) ("In accordance with *Celotex*, then, and to uphold the summary judgment entered by the district court, the [defendant] needs to have established as a matter of law that the [prior] judgment bars plaintiffs-appellants' claims . . . .").

Moreover, as noted by many courts, "[d]oubts are resolved against preclusion." *In re Associated Vintage Group, Inc.*, 283 B.R. 549, 562 (B.A.P. 9th Cir. 2002) (citing *Harris v. Jacobs*, 621 F.2d 341, 343 (9th Cir. 1980)).[1] As stated by the Second Circuit, "although the principles of *res judicata* should not be frugally applied, a reasonable doubt as to what was decided in the first action should preclude the drastic remedy of foreclosing a party from litigating an essential issue." *McNellis v. First Fed. Sav. & Loan Ass'n of Rochester*, 364 F.2d 251, 257 (2d Cir. 1966) (internal citations omitted) (finding that lower court's disposition concerning a supplemental complaint was "ambiguous" and thus refusing to apply claim preclusion for action based on same transaction as that in supplemental complaint). The rationale for this rule is evi-

---

[1] *See also In re Braniff Airways, Inc.*, 783 F.2d 1283, 1289 (5th Cir. 1986) ("[I]f reasonable doubt exists as to what was decided in the first action, the doctrine of res judicata should not be applied."); *Jane Does I through III v. District of Columbia*, No. CIV. A. 01-02398(HHK), 2002 WL 31840633, at *7 (D.D.C. Dec. 16, 2002) ("The burden of establishing preclusion is placed on the party claiming it, and reasonable doubts will be resolved against an asserted preclusion." (internal quotation marks and citations omitted)).

dent. If it is ambiguous and subject to reasonable doubt whether or not the plaintiff ever got a first bite (or even the opportunity to take a first bite) at the apple, to bar that claim forever would be unfair and would act as "a trap for the unwary." *Andersen*, 99 F.3d at 852. Certainly, if the party asserting claim preclusion cannot establish and the reviewing court cannot determine whether the claim was disposed by or ought to have been brought in the prior action, there is no guarantee that the party being precluded understood the situation either.

Many of the cases relied upon by the court today support the salutary role played by these corollary principles to ensure that res judicata is reserved for its proper use and not called upon to perform service for which it was never intended. Notably, both *Veltman v. Whetzal*, 93 F.3d 517 (8th Cir. 1996), and *In re Edwards*, 962 F.2d 641 (7th Cir. 1992), involved transfers of real estate free and clear of all liens; there was no question as to what was sold by the bankruptcy order. Similarly, *In re Met-L-Wood Corp.*, 861 F.2d 1012 (7th Cir. 1988), involved a liquidation sale of assets. In all three proceedings, the plaintiffs were attempting to nullify a sale to which they were party. Both parties understood that the specific property had been sold by the bankruptcy sale; and the plaintiffs understood that their only way to proceed would be to nullify that sale. We determined that such attempts to nullify the sale were barred by res judicata. Similarly, in *La Preferida*, after Corona had declared bankruptcy, the bankruptcy court, "correctly or incorrectly, . . . purported to sell *all* of Corona's trademarks" from Corona itself to another company, Modelo. *La Preferida*, 914 F.2d at 908. The plaintiff, La Preferida, having participated in the bankruptcy litigation and not prevailed, was bound by the bankruptcy court's determination when future litigation arose.

By contrast, the situation here is far more ambiguous. The bankruptcy court order does not establish clearly the nature of ICI's interest or the nature of the right ICI transferred to Amerifreight, MegaTrans' predecessor in interest.

In pertinent part, the bankruptcy order reads as follows:

> The Debtor is authorized to sell to Amerifreight *the Debtor's right, title, and interest in all patent, copyright and trade secret rights in and to all computer software* and corresponding documentation developed or acquired by the Debtor (the "Software") in consideration for $25,000.00. Amerifreight expressly acknowledges that the *Debtor may sell additional copies of the Software to other parties* and that by virtue of the proposed assignment *it has only a non-exclusive right to the Software*. The sale of the Software will be "as is" and without warranty of merchantability or fitness for any purpose. The sale of the Software to Amerifreight shall be free and clear of all liens, claims and encumbrances, with any liens, claims, and encumbrances attaching to the proceeds of the sale to Amerifreight.

R.35, Ex.31 at 1-2 (emphasis added).

The result of this ambiguity is evident in the different characterizations given the order. MegaTrans in its brief claims that it received "on a non-exclusive basis" ICI's right to exercise all of the copyright rights (the rights to reproduce, prepare derivative works, to distribute, to perform, and to display, *see* 17 U.S.C. § 106). Appellee's Br. at 14. ITOFCA submits that we should read the order much more tightly and that the sale only transferred a non-exclusive license to use the program and modify it for its own use. Consequently, in its view, the bankruptcy sale only authorized the transfer of "two modified copies of the 1986 ITOFCA Program—not the 1986 ITOFCA

Copyright itself." Appellant's Br. at 10. These various contentions illuminate the problem of employing res judicata in a case in which the court judgment supporting the use of that construct is ambiguous. At some point, whatever judicial efficiencies the doctrine might bring are outweighed by the need to probe the record in order to determine what the court meant. As that investigation becomes more complex and involves investigating at great lengths the underlying transactions, the risk of unfairly pretermitting the opportunity of a party to explain the situation also increases. As the following discussion demonstrates, the task placed on this court by the ambiguity of the underlying order in this case requires significant hesitation before applying res judicata.

ITOFCA created the original program and thus held the copyright (the bundle of the exclusive rights to reproduce, prepare derivative works, to distribute, to perform, and to display for the 1986 program, *see* 17 U.S.C. § 106). In the 1986 asset transfer agreement, ITOFCA transferred many of its assets to its wholly-owned subsidiary,[2] ICI, *see* R.33 at 3, ¶ 6. Sometime in 1986, ITOFCA provided ICI with a copy of the computer program, and ICI used and modified the program from 1987 until its insolvency in 1991. *See* R.41 at 7, ¶¶ 31-33. ITOFCA, as copyright owner could have transferred to ICI (1) by

---

[2] MegaTrans admitted that ICI began its existence as ITOFCA's "wholly-owned subsidiary," R.41 at 7, ¶ 31 and at 6, ¶ 28, but MegaTrans stated below in its own statement of facts that "ITOFCA never owned ICI," R.33 at 4, ¶ 9, which ITOFCA disputed by citing to the fact that ICI was ITOFCA's wholly-owned subsidiary. The parties agree that in 1989, ITOFCA negotiated the sale of ICI to Trade Transportation & Trust. *See* R.41 at 20, ¶ 99.

assignment, one or all or any part of its exclusive rights; (2) by exclusive license, one or all or any part of its exclusive rights; (3) by nonexclusive license, permission "to exploit any one or more of [its] rights or any subdivision of them."[3] Paul Goldstein, Copyright § 4.4.1 (2d ed. 2000 & 2002 Supplement); *see generally* 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright ch. 10 (2002) (discussing assignments, licenses, and other transfers of rights). By "nonexclusive," what is meant is that the licensee does not have an exclusive right—that is, the licensor may grant to another licensee the exact same right. *See I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996) (distinguishing between exclusive and nonexclusive licenses and noting that "[i]n an exclusive license, the copyright holder permits the licensee to use the protected material for a specific use and further promises that the same permission will not be given to others," while for a nonexclusive license, "[t]he copyright owner simply permits the use of a copyrighted work in a particular manner"); Robert A. Gorman, Copyright Law 53 (1991) (giving as an example of a nonexclusive license, "separate grants to several production companies to perform a dramatic work").

## B.

The bankruptcy court order effected the transfer of ICI's "right, title and interest" to Amerifreight and Southern

---

[3] Copyrights can also be transferred by other methods such as foreclosures on liens or mortgages, eminent domain, testamentary transfer or intestate succession, etc., but none of those methods apply in this case. *See* Paul Goldstein, Copyright § 4.4 (2d ed. 2000 & 2002 Supplement).

Pacific. R.35, Ex.31 at 1-2. In determining what interest ICI possessed and therefore was able to transfer to Ameritech and to Southern Pacific, a logical starting point is to examine what ITOFCA previously had transferred to ICI by an examination of the 1986 Asset Agreement.

My colleagues suggest that, regardless of the ambiguities in the bankruptcy order, it is extremely likely that ITOFCA transferred the copyright to ICI without reservation in the 1986 asset transfer agreement between ITOFCA and ICI (hereinafter "Asset Agreement"). The majority expresses "doubt" that the "evidence is enough to create a genuine issue of material fact as to whether the asset transfer agreement transferred the copyright." Slip op. at 8. In my view, the record cannot support such a suggestion. The district court explicitly stated that the record was unclear as to exactly what property rights ITOFCA conveyed to ICI under the Asset Agreement. In my view, the district court's perspective is more firmly grounded in the record.

The parties' submissions on the motion for summary judgment reveal that the issue of whether the Asset Agreement transferred the copyright was vigorously disputed. Certainly, the Asset Agreement itself is ambiguous. Although two of the "whereas" clauses in the Asset Agreement indicate that ITOFCA was selling all of its assets to ICI, another "whereas" clause indicates that "ITOFCA desires to retain substantially all the property and assets of ITOFCA and transfer only those assets used and necessary in the operations of the transportation services being transferred." R.35, Ex.16 at 1. The Asset Agreement does not mention transferring the copyright—nor does

it mention the software at all.[4] There was voluminous conflicting evidence. *See, e.g.,* R.41 at 7-17, ¶¶ 33-73 and exhibits; and R.35 at 4-9, ¶¶ 33-73 and exhibits.

In light of this situation, I cannot join my colleagues' estimation that, despite the ambiguity in the Asset Agreement itself and despite a disputed and conflicting record, ITOFCA "[p]robably" transferred the copyright to ICI through the Asset Agreement. Slip op. at 6.

As correctly explained by the majority, "[t]he copyright statute is explicit that there must be a memorandum in writing for the sale of the copyright to be enforceable. 17 U.S.C. §§ 202, 204(a)." Slip op. at 6. In this case there is no such writing. The Asset Agreement says nothing about copyrights, intangible assets, or even the computer software itself. The majority suggests that this omission in the agreement is of little consequence because (1) the Asset Agreement transferred all of ITOFCA's assets except a building and some cash and a copyright is neither a building nor cash, slip op. at 6; (2) the Asset Agreement was not required to use the word "copyright" to transfer the copyright, and a statement that "all assets" are transferred is sufficient because it "clearly includes copyrights," slip op. at 6-7; and (3) circumstantial evidence establishes that a copyright was sold, *see* slip op. at 5-8. I therefore turn to an examination of each of these areas.

---

[4] The agreement mentions transferring "software" in Appendix B, but the testimony indicated that the "software" referred to in Appendix B was entirely purchased software from outside vendors (such as operating systems, etc.) and not the software developed by ITOFCA and modified by ICI and later MegaTrans. *See* R.41 at 10, ¶¶ 49-50. It was an undisputed fact that "the 1986 ITOFCA Software Programs and 1986 ITOFCA Copyright were not included in Appendix B." *Id.* at ¶ 47.

**1.**

With respect to the Asset Agreement itself, the majority explains:

> The copyright on the computer program was an asset of ITOFCA. ITOFCA sold all its assets to ICI except a building and some cash. A copyright is neither a building nor cash. True, the asset transfer agreement also states that ITOFCA desires to "transfer only those assets used and necessary in the operations of the transportation services being transferred," but the copyright is one of those assets; it was used in ITOFCA's "transportation services"; that *was* ITOFCA's business that it exited through the sale to ICI.

Slip op. at 6. First, as noted previously, there is internal ambiguity in the agreement: Although one of the "whereas" clauses of the Asset Agreement essentially states that ITOFCA was selling to ICI all of its assets "except a building and some cash," slip op. at 6, another "whereas" clause limits this broad statement and reveals that "ITOFCA desires to retain substantially all the property and assets of ITOFCA and transfer only those assets used and necessary in the operations of the transportation services being transferred." R.35, Ex.16 at 1. It does not follow from this statement that the right to reproduce and sell copies of the program to third parties was included in the sale of assets. The only right that seems "necessary" to the freight forwarding service (and thus transferred by the Asset Agreement) is a copy with the right to use and modify the program, which is what ITOFCA argues was transferred. MegaTrans is being sued for reproducing and selling copies to other companies—not for using the program in its own freighting services. Commercial distribution of software does not appear to be "necessary" to conducting freight forwarding services and thus, on

that basis, cannot be said to be within the scope of the assets transferred by the Asset Agreement.

The majority recognizes this problem and states that "[a] possible reply" is that ICI "didn't need the copyright itself, but just the right that [17 U.S.C. § 117] gave it—the right to modify the program for its own use." Slip op. at 6. I agree that the right to modify the program is the only right "necessary" to its freight forwarding service and thus the only right necessarily conveyed by an asset transfer agreement that only transfers assets "necessary" to the business.

### 2.

Although there is a strict requirement that the transfer of a copyright interest be in writing, the majority is correct when it states that "it does not follow as ITOFCA believes that the agreement must use the word 'copyright,'" slip op. at 6, and that such a writing "can use terminology such as 'all assets' that clearly includes copyrights," *id.* at 7.

The cases cited by the majority indeed stand for the proposition that use of the word "copyright" is not always necessary, but it is somewhat notable that in none of the cases did the written agreement merely say "all assets" without reference to "rights," "intangible" property, or the underlying tangible property to which the intangible right attached. In all but one of the cited cases finding a transfer, the written agreement expressly conferred "all rights" in a specific piece of property, which the courts construed to include copyrights. *See S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989) (holding that an agreement in which a company retained "all rights of ownership" in a specific "series of programs" included the copyright); *Shugrue v. Cont'l Airlines, Inc.*, 977 F. Supp.

280, 285 (S.D.N.Y. 1997) (holding that agreement trans-
ferring " 'all right, title and interest' to '[a]ll of [its] com-
puter programs and software' " conveyed the copyright);
*Relational Design & Tech., Inc. v. Brock,* Civ. A. No. 91-2452-
EEO, 1993 WL 191323, at *6 (D. Kan. May 25, 1993) (holding
that agreement conferring " 'all rights to the completed
program with no licensing or royalties fees due' " conveyed
the copyright). Even in *Schiller & Schmidt, Inc. v. Nordisco
Corp.,* 969 F.2d 410, 413 (7th Cir. 1992), the one case in
which the agreement did not use the words "all rights"
concerning a specific piece of property, the court stated
that under the agreement "Bertel sold all the assets of
Spotline Studios, tangible and intangible alike." *Id.* In
contrast, the Asset Agreement does not specify the sale
of "intangible" assets at all. Moreover, the Asset Agree-
ment does not state that it is selling "all" of ITOFCA's
assets (either tangible or intangible), but merely all of the
assets "used and necessary" to the freighting business—
which would include the right to use and modify the
program, but not the right to reproduce and sell the pro-
gram. R.35, Ex.16 at 1.

### 3.

Finally, the majority also looks to circumstantial evi-
dence. Specifically, the majority notes that: (1) ITOFCA's
"failure to object to the bankruptcy court's order is com-
pelling evidence that its claim of right is an afterthought.
It knew it had no basis for objecting to the sale order,"
slip op. at 5; and (2) the "sheer impracticability of such
divided ownership" if ITOFCA retained the copyright
(because "ITOFCA no longer had any technical or sales
staff. It was a shell. How would it evaluate such a request
[for a license]? *Who* would evaluate the request? Would

ICI have consented to have such an albatross around its neck?"), slip op. at 7-8.

None of these issues was explored in the district court or during this appeal. To state on summary judgment that an agreement that says nothing about copyrights or intellectual property rights—or even mentions the underlying property—probably transferred a copyright conflicts with the purposes of section 204, which is designed to "ensure[] that the creator of a work will not give away his copyright inadvertently," to "enhance[] predictability and certainty of copyright ownership—'Congress' paramount goal'" in creating it. *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) (quoting *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 749 (1989)). "Rather than look to the courts every time they disagree as to whether a particular use of the work violates their mutual understanding, parties need only look to the writing that sets out their respective rights." *Id.*

More fundamentally, even if there is some circumstantial evidence that the agreement conveyed a copyright, there is also significant evidence that the agreement was not intended to transfer the copyright, namely: (1) only assets "used and necessary" to the freighting business were transferred by the Asset Agreement, and rights of reproduction and sale of the computer program are arguably not necessary for that purpose; (2) the Asset Agreement does not say anything about copyrights, intangible property rights (except the ITOFCA trademark), or "rights" in computer programs[5]—in fact, it does not even mention

---

[5] Other sections of the Asset Agreement bolster the argument that it was not intended to transfer the copyright of the computer program. Outside of the "whereas" clauses, which

(continued...)

the software at issue; (3) Amerifreight, through its rep-
resentative Daniel Sullivan,[6] appeared to believe that
ITOFCA owned the copyright; (4) ICI's statement on its

---

[5] (...continued)
have been discussed at length, the Asset Agreement expressly
transfers the personal property listed in Appendix B, where
neither the copyright nor the program are listed. Elsewhere
in listing all of the assets to be transferred at closing, the Asset
Agreement accounts for transfers of personal property by title
transfer, leases and subleases, bills of sale for nontitled property,
insurance policies, employee pension and retirement, lines of
credit, operating contracts, and even a license of the ITOFCA
trademark. R.35, Ex.16 at 4. But there is no mention of copy-
rights or intangible assets outside of the ITOFCA trademark.
MegaTrans argued that the reason why the software did not
appear in the bill of sale or Appendix B to the Asset Agreement
was because it had been expensed in the salaries rather than
capitalized. *See* R.41 at 29-30. That does not explain why there
was not a document transferring the copyright of the program,
similar to the license of the ITOFCA trademark, which was
contained in the Asset Agreement.

[6] Sullivan was more than just the former "president of ICI," as
stated by the majority, slip op. at 8; it was undisputed that he
actually drafted the Asset Agreement in his previous capacity
as ITOFCA's general counsel. *See* R.34 at 5, ¶ 35; R.41 at 7, ¶ 35
(MegaTrans' admission that "[t]he 1986 Asset Agreement
was primarily drafted by Daniel Sullivan"); R.32 at 1. In fact,
it was undisputed that in drafting the Asset Agreement be-
tween ITOFCA and ICI, Sullivan "was the only lawyer involved
for either ITOFCA or ICI, and Mr. Sullivan acted as counsel
for both ITOFCA and ICI." R.41 at 7-8, ¶ 36. Therefore, evi-
dence that Sullivan, when speaking on behalf of Amerifreight,
"acknowledged at one point that ITOFCA retained the copy-
right" despite the Asset Agreement, slip op. at 8, strongly sug-
gests that the Asset Agreement did not transfer the copyright.

bankruptcy schedule that it had no copyright or other intangible property rights.

Certainly there is evidence sufficient to permit a reasonable finder of fact to find that the Asset Agreement failed to transfer the copyright. In reviewing a grant of summary judgment, a court is to "construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party." *Mateu-Anderegg v. Sch. Dist. of Whitefish Bay*, 304 F.3d 618, 623 (7th Cir. 2002) (citation omitted). Considering the conflicting evidence and the fact that the Asset Agreement itself is not only ambiguous but fails to even purport to convey a copyright interest in the software a genuine issue of material fact exists as to whether the Asset Agreement transferred the copyright.

## C.

Because the Asset Agreement affords us no solid basis for determining the nature of the property rights that ITOFCA transferred to ICI, I must turn to the bankruptcy order. The bankruptcy order authorizes the sale of rights in the "Software" to two parties: Southern Pacific and Amerifreight. *See* R.35, Ex.31 at 1-2. The "Software" is defined by the bankruptcy court as "the Debtor's [ICI's] right, title and interest in all patent, copyright and trade secret rights in and to all computer software and corresponding documentation developed or acquired by the Debtor (the "Software")." R.35, Ex.31 at 1. After defining "Software" in the order's authorization to sell the Software to Amerifreight, the court authorizes ICI also to sell its "right, title and interest in the Software to Southern Pacific." *Id.* at 2. Thus both Amerifreight and Southern Pacific obtained the Debtor's "right, title and interest" in "all

patent, copyright and trade secret rights in and to all computer software." *Id.* at 1-2. For both conveyances, the order gives the same limitation: "the Debtor may sell additional copies of the Software to other parties and that by virtue of the proposed assignment [Amerifreight; Southern Pacific] has only a non-exclusive right to the Software." *Id.*

The bankruptcy's order makes clear that Amerifreight was not granted the copyright. Nor was it granted an exclusive license. The order could not grant either a copyright or an exclusive license to Amerifreight because it granted to both Southern Pacific and Amerifreight exactly the same rights. There is only one copyright and only one owner of each piece of an exclusive right. Goldstein, Copyright § 4.4.1. Therefore, the bankruptcy order could not have given both Southern Pacific and Amerifreight the *same* exclusive rights. Thus, whatever was transferred had to be a nonexclusive license.

A nonexclusive license "does not transfer ownership of the copyright to the licensee. The copyright owner simply permits the use of a copyrighted work in a particular manner." *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996); *see also id.* at 775 n.7 ("'In its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent.'" (quoting *W. Elec. Co. v. Pacent Reproducer Corp.*, 42 F.2d 116, 118 (2d Cir. 1930))).

A nonexclusive license therefore gives a licensee permission to do whatever is within the scope of that license. *See Shaver*, 74 F.3d at 774-76 & n.8; *Gracen v. Brandford Exch.*, 698 F.2d 300, 303-04 (7th Cir. 1983). If one receives a license to reproduce and sell five copies, then he may reproduce and sell five copies, but no more. *See, e.g., Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 831-33 (8th Cir.

1992) (finding that promoter was authorized to reproduce and sell 13,000 copies of book, but not 300,000 additional copies); *Kennedy v. Nat'l Juvenile Det. Ass'n*, 187 F.3d 690, 694 (7th Cir. 1999) (construing "a nonexclusive license to reproduce, publish, and use Kennedy's copyrighted report"); *MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769, 779 (3d Cir. 1991) (finding implied nonexclusive license to develop and use software for one external account but no others).

A copyright owner can grant a nonexclusive license "orally, or may even be implied from conduct. . . . In fact, consent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license and is not required to be in writing." *Shaver*, 74 F.3d at 775; *see also Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 752 (11th Cir. 1997) (holding that nonexclusive license was created by the copyright owner "giving permission" and "failing to object despite his knowledge" of the use of his song).

" 'A licensee infringes the owner's copyright if its use exceeds the scope of its license.' " *Shaver*, 74 F.3d at 775 n.8 (quoting *S.O.S.*, 886 F.2d at 1087); *see also S.O.S.*, 886 F.2d at 1087-88 ("The critical question is not the existence but the scope of the license."); *Gillam v. Am. Broad. Cos., Inc.*, 538 F.2d 14, 20-21 (2d Cir. 1976) (noting that "[o]ne who obtains permission to use a copyrighted" work "may not exceed the specific purpose for which permission was granted" and concluding that "unauthorized editing of the underlying work, if proven, would constitute an infringement of the copyright in that work similar to *any other use of a work that exceeded the license granted* by the proprietor of the copyright" (emphasis added)); *WGN Cont'l Broad. Co. v. United Video, Inc.*, 693 F.2d 622, 625 (7th Cir. 1982) (same); *Glovaroma, Inc. v. Maljack Prods., Inc.*, 71 F. Supp. 2d 846, 855-56 (N.D. Ill. 1999) (holding that

summary judgment dismissing infringement claim was inappropriate where scope of license was unclear). Also, it has been held by several courts and noted by commentators that a nonexclusive license cannot be transferred without permission of the copyright owner. *See Gadner v. Nike, Inc.*, 279 F.3d 774 (9th Cir. 2002) (holding that neither exclusive nor nonexclusive licenses can be transferred absent copyright owner's authorization); *In re Golden Books Family Entm't, Inc.*, 269 B.R. 311, 314-19 (Bankr. D. Del. 2001) (holding that nonexclusive licensees cannot transfer their licenses without prior authorization from copyright owner, but that exclusive licensees can transfer licenses without authorization); *In re Patient Educ. Media, Inc.*, 210 B.R. 237, 242-43 (Bankr. S.D.N.Y. 1997) (holding that nonexclusive license is not transferable without copyright owner authorization); Nimmer & Nimmer, 3 Nimmer on Copyright § 10.02[B][4]; Goldstein, Copyright § 4.4.1.

Because the bankruptcy order gave two parties exactly the same rights (all the rights held by ICI, except ICI's right to sell to others), the only interest that the bankruptcy order could have transferred was a nonexclusive license. The fact that ICI sold two copies of the software is not troublesome. ICI made the second copy with the permission, or, at the very least, with the lack of objection, of ITOFCA at the time of the bankruptcy order. "[C]onsent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license." *Shaver*, 74 F.3d at 775. Thus ICI was authorized to make a copy for Southern Pacific.[7]

---

[7] Transfers of nonexclusive licenses generally require permission from the copyright owner. The bankruptcy transfer from ICI to Amerifreight was not problematic. If all ICI owned was

(continued...)

There is significant force therefore in the majority's view that, although we may not be able to determine exactly the contours of ICI's right, ICI must at least have had the right to sell because the order reserved ICI's right to sell additional copies to others.

This view is compatible with MegaTrans' position. It does not argue that the bankruptcy order transferred the copyright itself. *See* Appellee's Br. at 14. Rather, MegaTrans submits that the order transferred to itself (and, I add, consequently, to Southern Pacific) the ability to exercise the rights of a copyright owner, minus the right to exclusivity (in other words, a nonexclusive license to prepare derivative works, reproduce, distribute, etc.). In MegaTrans' view, ICI conveyed its "full right to *exercise* all copyright rights"—not own them. Appellee's Br. at 14 (emphasis added; internal quotations and ellipses omitted). In short, it would exercise those rights on a nonexclusive basis. As stated by the district court, ITOFCA "relinquished any claim to *exclusive* ownership of the copyright," arguably because it authorized Amerifreight

---

[7] (...continued)
a nonexclusive license and ITOFCA owned the copyright, ITOFCA, by failing to interpose an objection at the bankruptcy proceeding, gave its permission or failed to make a proper objection. It therefore authorized the transfer of the nonexclusive license to Amerifreight. The record does not address Amerifreight's further transfer to MegaTrans. ITOFCA has never suggested, on this record, that Amerifreight failed to obtain its permission with respect to this transfer. My examination of the record reveals that, although MegaTrans was not incorporated until after the hearing on this matter before the bankruptcy court, ITOFCA apparently had some knowledge that the plan was for Amerifreight to give the program to another entity.

and Southern Pacific to exercise simultaneously all owner-ship rights. Appellee's Br. at 13-14; R.42 at 7. This view is strongly supported by the wording of the actual assign-ment to Amerifreight (as opposed to the bankruptcy order authorizing the assignment), which assigns "on a <u>non</u>-exclusive basis, the full right to *exercise* all patent, copyright, and trade secret rights in and to all computer software." R.35, Ex.32 (underlining in original; italics added). It fur-ther recites that "Amerifreight expressly acknowledges that, while it may *exercise* all rights of patent, copyright, or trade secret owner, it has only a <u>non</u>-exclusive right to the foregoing Intellectual Property Rights to the ICI soft-ware and documentation, and that ICI is free to sell addi-tional copies of the ICI software and documentation to other third parties." *Id.* (underlining in original; italics added).

Under this view, the language in the bankruptcy order concerning "all . . . rights" and yet "non-exclusiv[ity]" also makes sense. R.35, Ex.31 at 1. Additionally, this view is consistent with the dialogue in the bankruptcy court about whether ICI was transferring a nonexclusive license.

## D.

Although the question is a close one, I believe that the terms of the bankruptcy sale are sufficiently clear to per-mit us to hold that the judgment of that court ought to preclude the relitigation of ITOFCA's claim that ICI could not transfer to Amerifreight the right to transfer further to MegaTrans the right to sell the program. Al-though the ambiguity created by the order, as well as by the parties' failure to deal clearly with the issues, have diluted substantially the usual benefits of judicial econ-omy that accompany the use of the doctrine of res judicata,

the possibilities of inaccuracy are not so increased by those lapses as to preclude application of that doctrine. On this basis, I concur in the decision of the court to affirm the judgment of the district court.

A true Copy:

   Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*