**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-2014**

TATTOO ART INCORPORATED,

          Plaintiff – Appellee,

     v.

TAT INTERNATIONAL LLC; KIRK A KNAPP,

          Defendants - Appellants.

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.  Mark S. Davis, District Judge.  (2:10-cv-00323-MSD-DEM)

Argued:  October 25, 2012      Decided:  December 10, 2012

Before TRAXLER, Chief Judge, and WILKINSON and AGEE, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Nicholas Shaker Ayoub, WHEELER UPHAM, PC, Grand Rapids, Michigan, for Appellants.  Mark R. Baumgartner, PENDER & COWARD, PC, Virginia Beach, Virginia, for Appellee.  **ON BRIEF:** Christopher Gibbons, DUNN/GIBBONS, Grand Rapids, Michigan, for Appellants.  Kristen R. Jurjevich, PENDER & COWARD, PC, Virginia Beach, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Plaintiff-Appellee Tattoo Art, Inc. ("Tattoo Art") brought this action against Defendants-Appellants TAT International, LLC ("TAT") and Kirk A. Knapp, alleging claims for copyright infringement and breach of a copyright license agreement. The district court granted Tattoo Art's motion for partial summary judgment as to liability on both causes of action. The district court then conducted a bench trial solely as to damages and awarded actual damages of $18,105.48 on the breach of contract claim and statutory damages under the Copyright Act of $480,000 on the infringement claim. TAT appeals various aspects of the district court's rulings as to both liability and damages. We affirm.

I.

Tattoo Art is a Virginia company owned by Joseph Dufresne, who uses the trade name J.D. Crowe. Tattoo Art holds copyright registrations for hundreds of colorized "tattoo flash" art designs created by Dufresne. A tattoo flash is an original drawing or design of a tattoo printed or drawn on a sheet of paper or a poster and often displayed on the walls of tattoo parlors to give customers design ideas for the tattooist to copy.

To avoid the cost of copyright registration for hundreds of individual works, Tattoo Art grouped its tattoo flash designs into "Books" consisting of 50 pages or "sheets." Each sheet, in turn, displayed numerous individual tattoo designs; Tattoo Art, however, secured only a single copyright registration for each 50-sheet Book. Tattoo Art licenses interested parties to use its copyrighted flash designs in tattoos, posters, cell phone covers, and t-shirts among other things. In this case, Tattoo Art granted permission to TAT, a Michigan company owned by Knapp, to use the copyrighted designs. Among other things, TAT creates and sells stencils for use in applying temporary airbrush body art.

In December 2005, Tattoo Art and TAT entered into an agreement permitting TAT to use specified copyrighted flash drawings to create stencils for temporary airbrushed tattoos. According to Tattoo Art, the complete terms of the parties' agreement were contained within a 10-page typewritten "License Agreement" (or "the Agreement"), a signed copy of which Tattoo Art attached and incorporated into its complaint. The License Agreement granted TAT the right to use the specified tattoo designs[1] "for the manufacture, offer for sale, sale,

---

[1] The License Agreement identified 711 individual designs, most of which were unregistered, covered by the license. There is no dispute that Tattoo Art held copyright registrations for
(Continued)

3

advertisement, promotion, shipment, and distribution of the Licensed Articles." J.A. 253. "Licensed Articles," in turn, was defined as "Stencils for use in applying airbrush body art." Id. The licensing clause limited TAT's use of the copyrighted flash designs to "the creation and sale of Stencils for the application of airbrush body art" and permitted TAT to "distribute graphic representations (including photographs and/or posters)" of the tattoo flash designs only if it did so "in connection with the sale of Stencils. No other use . . . is granted by this License." J.A. 254.

Under the terms of the License Agreement, TAT was required to make quarterly royalty payments of 12.5 percent of its gross sales, if any, of licensed articles created pursuant to the License Agreement, and no less than $6,000 annually, regardless of gross sales. TAT was also obligated under the Agreement to provide Tattoo Art with quarterly sales reports.

Finally, the License Agreement provided an initial term of three years, after which it would continue on a year-to-year basis unless one party elected not to renew, in which case the Agreement would expire at the end of the 12-month period during which notice of nonrenewal was given. The License

212 of these designs which came from 24 of Tattoo Art's registered Books.

4

Agreement also reserved exclusively for Tattoo Art the option of terminating "in the event of a breach" by TAT. J.A. 254. If the Agreement was not renewed by either party, TAT was permitted to "dispose of finished Licensed Articles on hand or in process . . . for a period of twelve (12) months thereafter." J.A. 256. That is, TAT could continue to promote and sell existing inventory derived from the copyrighted designs. If, however, Tattoo Art terminated based on TAT's breach, TAT was obligated under the License Agreement to "immediately cease all sales." J.A. 257.

TAT concedes that an agreement exists but denies that the written License Agreement constituted the final agreement. Instead, TAT claims that Knapp and Dufresne orally modified some of its terms after Knapp received a fax from Tattoo Art of the proposed License Agreement on December 29, 2005. The alleged modifications included the right for TAT to sell all existing licensed inventory in the event of termination, regardless of the reason, and the elimination of the $6000 minimum annual royalty payment. According to TAT, Tattoo Art promised to prepare a revised License Agreement to reflect the alleged oral modifications. TAT concedes that Knapp signed the signature page on its behalf and faxed it back to Tattoo Art on the understanding that the signature page would be attached to the "revised" License Agreement. TAT contends, however, that a

5

revised Agreement was never prepared or sent and that TAT did not receive a complete copy of the signed License Agreement until the lawsuit was underway.

Following the execution of the signature page by Knapp, TAT made three of the four required quarterly royalty payments in 2006, the total of which was $653. The last royalty payment was made in October 2006, after which time TAT sent no further royalty payments or sales reports. In fact, the parties apparently had no further contact until February 2009. In the meantime, TAT had changed the coloring of Tattoo Art's designs and was displaying these re-colored images on TAT's website to promote its stencils. TAT also removed the copyright notice from the re-colored images and referred to the images collectively as its "Original Collection."

After having remained silent for two years despite TAT's failure to send royalty payments or reports, Tattoo Art contacted TAT in February 2009. TAT promised to come current with the missed royalty payments and reports but failed to do so. On May 14, 2009, Tattoo Art sent TAT a termination letter, advising TAT to cease any further use of licensed property and demanding an accounting of all sales up to that date. The termination was based on TAT's "failure to pay the minimum royalties and/or report royalties." J.A. 835. Nonetheless, TAT continued to sell stencils derived from the licensed property

6

and to use altered designs and artwork in the sale and promotion of these items on its website.

In July 2009, Tattoo Art filed an action for breach of the License Agreement and copyright infringement. Relying on a mandatory mediation provision in the License Agreement, TAT argued that Tattoo Art was required to submit any dispute to mediation before filing an action to enforce the Agreement. The district court agreed and granted TAT's motion to dismiss. The parties then submitted the case to mediation but were unable to achieve a resolution.

In July 2010, Tattoo Art re-filed the action, again asserting claims for breach of the License Agreement and copyright infringement. TAT pled the affirmative defenses of fraudulent inducement, unclean hands and equitable estoppel. Tattoo Art subsequently filed a motion for partial summary judgment as to liability. The district court granted Tattoo Art's motion for summary judgment, concluding that TAT had breached the Agreement and infringed on the copyrights held by Tattoo Art. The district court then held a bench trial as to damages, after which it entered an order awarding Tattoo Art $18,105.48 on the breach of contract claim and statutory damages under the Copyright Act of $480,000 on the infringement claim.

7

TAT first challenges the district court's grant of partial summary judgment in favor of Tattoo Art as to liability on its breach of contract claim. We review the district court's grant of summary judgment de novo. See Temkin v. Frederick Cnty. Comm'rs., 945 F.2d 716, 718 (4th Cir. 1991). Summary judgment shall be granted if the movant shows that there is "no genuine dispute as to any material fact" and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The proponent initially bears the burden of demonstrating the absence of any genuine issue of material fact. See Temkin, 945 F.2d at 718. If the proponent succeeds in doing so, the opposing party must present facts sufficient to create a triable issue. See id. at 718-19. Tattoo Art fulfilled this initial obligation by producing the signed License Agreement and presenting evidence that TAT failed to pay royalties or provide quarterly sales reports required by the Agreement.

TAT responds that the question of whether the parties orally modified the License Agreement presented an issue of material fact that was not amenable to resolution at the summary judgment stage. We disagree. A party asserting the existence of a genuine issue of material fact must support its assertion by "citing to particular parts of materials in the record,

8

including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A). TAT failed to point to anything in the record or proffer any evidence that would create a material dispute of fact about the terms of the Agreement. The sole support TAT offered for its claim that various terms of the Agreement had been modified was a copy of the License Agreement displaying some handwritten margin notes regarding a few of the disputed provisions. TAT, however, offered no deposition or affidavit testimony verifying who made the notes or when they were made. Because TAT failed to "point to [any] document that contains what [it] contend[s] are the definitive terms of the Agreement," J.A. 370, the district court had no choice but to conclude that the version of the License Agreement incorporated into Tattoo Art's complaint was definitive.

The district court found other bases for rejecting TAT's oral modification claim, including the existence of a merger clause in the License Agreement. This clause provided that the written "Agreement constitutes the entire agreement and understanding between the parties" and that any modifications of its written terms were invalid unless contained in "a written document signed by both parties." J.A. 259. The district court concluded that the signed signature page reflected TAT's assent

9

that no oral modifications could be made to the License Agreement, and TAT has not argued on appeal that the merger clause was not part of the License Agreement.[2] We agree with the district court and find no error in the district court's rulings. Accordingly, we affirm the grant of summary judgment on Tattoo Art's breach of contract claim.

B.

"[T]he Copyright Act grants the copyright holder 'exclusive' rights to use and to authorize the use of his work in five qualified ways, including reproduction of the copyrighted work in copies," Sony Corp. v. Universal City Studios, Inc., 464 U.S. 417, 432-33 (1984), and the right "'to display the copyrighted work publicly,'" N.Y. Times Co. v. Tasini, 533 U.S. 483, 496 n.4 (2001) (quoting 17 U.S.C. § 106(5)). Under the Copyright Act, "[a]nyone who violates any of

---

[2] The district court also concluded that under Virginia law, the alleged oral modifications would have been invalid under the statute of frauds in view of the License Agreement's initial term of 36 months. See Va. Code § 11-2 (mandating that "any agreement that is not to be performed within a year" must be "in writing and signed" to be enforceable). Under certain circumstances "where there has been part performance," however, equity requires that the statute of frauds be avoided and the oral agreement enforced. T.G. Slater & Son, Inc. v. Donald P. & Patricia A. Brennan, L.L.C., 385 F.3d 836, 841 (4th Cir. 2004). We need not address this basis for the district court's ruling in light of our disposition on other grounds.

10

the exclusive rights of the copyright owner . . . is an infringer of the copyright." 17 U.S.C. § 501(a). "A licensee infringes the owner's copyright if its use exceeds the scope of its license." ITOFCA, Inc. v. MegaTrans Logistics, Inc., 322 F.3d 928, 940 (7th Cir. 2003) (internal quotation marks omitted)). Thus, "[o]ne who obtains permission to use a copyrighted" work "may not exceed the specific purpose for which permission was granted," Gilliam v. Am. Broad. Cos., 538 F.2d 14, 20 (2d Cir. 1976), and "unauthorized editing of the underlying work . . . constitute[s] an infringement of the copyright in that work similar to any other use of a work that exceeded the license granted by the proprietor of the copyright," id. at 21.

The district court determined that TAT's alteration of the coloring of Tattoo Art's designs for display on TAT's website was beyond the scope of TAT's license under the Agreement and therefore constituted copyright infringement prior to termination of the License Agreement by Tattoo Art in May 2009. The district court concluded further that because Tattoo Art terminated the License Agreement as a result of TAT's breach, TAT was prohibited under the terms of the Agreement from any further use of the copyrighted works following termination.

11

We agree. TAT was given license to use the copyrighted tattoo flash artwork to create stencils and to use copies of the artwork to promote the stencils. The Agreement did not license TAT to edit, modify or alter the copyrighted works it was licensed to display for marketing purposes, and therefore such use constituted copyright infringement. In the post-termination context, TAT's continued display of the copyrighted works constituted infringement for the additional reason that TAT was contractually required to "immediately cease all sales" of the stencils in light of Tattoo Art's notice of termination for breach.

On appeal, TAT argues that the district court should have permitted it to pursue its equitable estoppel affirmative defense at trial. To establish an estoppel defense to copyright infringement, TAT must show that Tattoo Art "(1) misrepresented or concealed material facts, (2) intended or expected that [TAT] would act upon those misrepresentations or concealments, and (3) had actual or constructive knowledge of the true facts." Service & Training, Inc. v. Data General Corp., 963 F.2d 680, 690 (4th Cir. 1992). TAT has not directed us to any record evidence suggesting that Tattoo Art misrepresented or concealed material facts that would have caused TAT, in reliance upon such misrepresentations, to infringe. Accordingly, we

12

affirm the grant of partial summary judgment as to liability on Tattoo Art's copyright infringement claim.

## III.

Following a bench trial on the issue of damages, the district court issued a 77-page order ruling on numerous issues. After concluding that TAT owed a total of $20,250 in royalties, plus pre- and post-judgment interest but less any payments previously made, the district court considered the appropriate amount of damages to award for the copyright infringement. Under 17 U.S.C. § 504(a), "an infringer of copyright is liable for either—(1) the copyright owner's actual damages and any additional profits of the infringer . . . or (2) statutory damages, as provided by [§ 504(c)]." Tattoo Art elected to recover statutory damages under 17 U.S.C § 504(c)(1), which permits the offended copyright owner to recover between a minimum of $750 and a maximum of $30,000 per infringement of a given work, "as the court considers just." In cases where the copyright owner shows that the infringement was committed willfully, the Copyright Act authorizes enhanced statutory damages of up to $150,000 per infringed work. See 17 U.S.C. § 504(c)(2).

The district court concluded that Tattoo Art was not entitled to enhanced damages even though there was some evidence

13

of willfulness. The court found that even were it to accept the explanation offered by TAT at trial for changing the coloration—that the modified color scheme was a more effective marketing tool for the stencils—"any potential legitimacy that such a business justification might have had was entirely overshadowed by the illegitimacy of the circumstances. . . . The very name chosen by [TAT] for [its] derivative [licensed products]-the Original Collection is particularly telling." J.A. 706. Nonetheless, the district court could not "conclude definitively" that TAT willfully engaged in copyright infringement. J.A. 709. Thus, the court determined the appropriate statutory damages range was $750 to $30,000 per infringement, as prescribed by § 504(c)(1).

In determining the number of infringements that occurred, the district court rejected Tattoo Art's argument that the display of each individual recolored image was a separate copyright violation; instead, the district court decided that each of Tattoo Art's registered "Books" constituted a compilation. See 17 U.S.C. § 101. "Although parts of a compilation . . . may be regarded as independent works for other purposes, for purposes of statutory damages, they constitute one work." Xoom, Inc. v. Imageline, Inc., 323 F.3d 279, 285 (4th Cir. 2003) (internal quotation marks and alteration omitted), abrogated on other grounds, Reed Elsevier, Inc. v.

14

Muchnick, 130 S. Ct. 1237 (2010). Thus, the district court concluded that Tattoo Art was entitled to only one award of statutory damages for each book that was infringed. Because the images used by TAT came from 24 of Tattoo Art's registered books, the district court determined that Tattoo Art was entitled to 24 statutory damage awards. Neither party specifically challenges the court's method of determining the number of infringements committed by TAT.

Finally, as to where the district court should fix the amount of statutory damages for each infringement within the $750 – $30,000 range, see 17 U.S.C. § 504(c)(1), the district court found that Tattoo Art's conduct fell "closer to the willful end of the spectrum than the innocent end," J.A. 719, and set the amount at $20,000, yielding a total of $480,000 for the 24 infringements, plus pre- and post-judgment interest.

On appeal, TAT does not specifically challenge how the district court arrived at this $20,000 figure. Rather, TAT broadly challenges the total amount of the award, contending that it was grossly disproportional to the amount of actual damages Tattoo Art could have recovered under the Minimum Royalty payment provision of the License Agreement (purportedly 25 times more) or the amount of unpaid royalties due for TAT's actual sales (purportedly 68 times more). TAT cites State Farm Mutual Automobile Insurance Company v. Campbell, 538 U.S. 408

15

(2003), and BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), to support its argument that the statutory damages award is subject to proportionality review. Those cases, however, involve proportionality review of punitive damages awards, not statutory damages awards where Congress has limited the district court's discretion by establishing a statutory range. TAT is essentially arguing that these awards within the statutory range were constitutionally excessive. This is an unavailing argument. We review for clear error any factual finding that would determine the appropriate level of copyright statutory damages, but we review an award of those damages within the statutory range for abuse of discretion. See Lyons Partnership, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 799 (4th Cir. 2001). In this case, the district court articulated a reasonable basis for fixing statutory damages at $20,000, and we perceive no abuse of discretion or constitutional error in the district court's conclusions.

Finally, we reject TAT's contention that the district court improperly awarded both actual damages for breach of the License Agreement and statutory damages for copyright infringement under 17 U.S.C. § 504(c)(1). The Copyright Act permitted Tattoo Art to elect to recover "either—(1) the copyright owner's actual damages and any additional profits of the infringer . . . or (2) statutory damages, as provided by [§

16

504(c)]." See 17 U.S.C. § 504(a). Tattoo Art elected and received statutory damages on its infringement claim; the award of actual damages was not for the infringement claim but for TAT's failure to pay royalties under the License Agreement. The election required by the Copyright Act pertains to infringement claims, i.e., an infringement plaintiff cannot recover both actual and statutory damages for the same act of infringement. That is not what occurred in this case, however, because the district court awarded actual damages only for TAT's breach of the License Agreement, not for copyright infringement.

IV.

For the foregoing reasons, we affirm the orders of the district court.

AFFIRMED